[Crim. No. 20380. Aug. 29, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM HARRIS KING, Defendant and Appellant.

**COUNSEL**

Paul N. Halvonik, State Public Defender, Clifton R. Jeffers, Chief Assistant State Public Defender, Ezra Henson and Tanya Neiman, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and John W. Runde, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

MANUEL, J.—Defendant William Harris King appeals from a judgment (order granting probation) entered on a jury verdict finding him guilty of violating Penal Code section 12021.[1] He contends that the trial court erred in refusing his request that the jury be instructed on self-defense. The People argue that self-defense is not a. defense to a charge of violating section 12021.

As we shall explain, we have concluded that in enacting section 12021 the Legislature did not intend to deny persons described by that section the right to use a concealable firearm in defense of self or others in emergency situations, and that in this case it was error to refuse to give instructions on self-defense. Because the omission of these instructions denied defendant his right to have the jury consider issues material to his guilt, we reverse the conviction. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Because the right to instructions on self-defense is the central issue in this appeal,[2] our recital of the evidence introduced at trial is necessarily

---

[1]Section 12021 provides in relevant part: "Any person who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government, or country, or who is addicted to the use of any narcotic drug, who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person, is guilty of a public offense, . . ."

Unless otherwise specified, all statutory references herein are to the Penal Code.

[2]Our resolution of this claim makes it unnecessary to consider defendant's claims that he received ineffective assistance by trial counsel and that the trial court erred in denying his motion for new trial.

one emphasizing matters which would justify such instructions, rather than the customary summary of evidence supporting the judgment. (See, e.g., *People* v. *Holt* (1944) 25 Cal.2d 59, 62 [153 P.2d 21]; *People* v. *Jackson* (1965) 233 Cal.App.2d 639, 640 [43 Cal.Rptr. 817].)

During the late evening hours of August 9, 1975, and continuing into the early morning of August 10, 1975, Carrie Foster hosted a birthday party for her friend Raymond Meggs in her second floor apartment on DeRose Avenue in San Jose. The apartment had only one entrance, a door on a balcony-walkway overlooking an interior court. The only other opening to the balcony was a window in the wall of the living-dining area near the door.

Shortly after 10 p.m. on August 9th, invited guests began to arrive at the party. As many as 30 to 40 people were present in the apartment at times. Many of the invited guests were fellow employees of Ms. Foster, others were friends who attended San Jose State University. Not all of the guests were admitted by Ms. Foster personally. Among those admitted by friends who were assisting her were Dennis Montgomery and Arnold Hart, neither of whom had been invited. Defendant, an invited guest, arrived between 11 p.m. and midnight with Benny Irving, Pam Burrell, and Mary Jones. He and Ms. Burrell left briefly to go to a store, but returned within 45 minutes.

Within a few minutes of their arrival at the party Montgomery and Hart became dissatisfied with the lack of interest other guests had in dancing with them or providing them with food. They demanded condiments for the food they had been given, and when told that the requested items were unavailable began ransacking the kitchen cabinets. Raymond Meggs remonstrated with them. Arnold Hart took umbrage at the treatment he and Montgomery had received and was either invited to leave or challenged Meggs to step outside to pursue the matter. The two men left the apartment and, following a further heated exchange of words, a fight between them ensued on the small balcony outside the apartment door. While this fight was in progress a group of as many as eight additional uninvited men, friends of Montgomery and Hart, arrived at the location and began to climb the stairs to the balcony. Meggs and Hart abandoned their fight briefly, and had almost reentered the apartment when the fight resumed with others becoming involved in an attempt to separate the pair.

Inside the apartment Ms. Foster had become alarmed. She told her guests that the party was over. Most left. Andrea Armstrong had heard

Meggs state that the party was over, but when she attempted to leave she was confronted by the group of uninvited men approaching the apartment and had retreated inside again. Remaining in the apartment at this point were only defendant, Benny Irving who was disabled and confined to a wheelchair, Kenny Bolding, and five women. It was now approximately 2 a.m.

The disturbance outside the apartment continued as the newly arrived friends of Montgomery and Hart ascended the stairs. One member of this group attempted to enter the apartment, but was stopped by Ms. Foster who told him that the party was over and attempted to shut the door. The intruder forced his foot into the doorway, however, preventing her from closing the door. He was both drunk and belligerent. When Kenny Bolding came to the door the intruder attempted to strike Bolding, but during the attempt moved his foot enabling Ms. Foster to close the door. She thereupon retreated to a back bedroom where she was crying as a result of her fear and her distress that the "crashers" had ruined the party and were attempting to break up her apartment.

Andrea Armstrong and Mary Jones, both of whom had also become concerned for their safety as the disturbance escalated, joined Ms. Foster in the bedroom. Ms. Armstrong heard screaming and a crashing sound coming from the front of the apartment, followed by the sound of running feet and a pounding on the door. She ran to hide in a closet, but was stopped by Ms. Foster who asked her to telephone the police, which she did.

Mary Jones had seen the intruder put his foot in the door and after the door had been shut heard him threaten to tear the door down. She heard a window break and heard kicking and pounding on the door. Frightened and screaming she had retreated to the bedroom. She thought of jumping from the window. She was particularly frightened because she knew some of the intruders and had seen them fighting at another party. She believed the group was breaking into the apartment.

Mildred Arline ran to the bedroom, tripping over an electrical cord as she did so, when she heard the window break. She was frightened by the fighting and did not know what was happening.

Defendant had not become involved in any way in the escalating violence. He did not take part in the attempts to separate Meggs and Hart who continued to fight out on the balcony. At the point when Ms. Foster managed to shut the door and the intruders outside began kicking and

pounding on it and threatening to break it open, James Long, one of that group, picked up a double hibachi grill that was on the balcony in front of the neighboring apartment, and threw it through the window into the dining area where defendant was seated at a table with Benny Irving. The grill struck defendant and showered both defendant and Irving with glass, some particles of which lodged in defendant's eyes. As soon as he managed to wash the glass from his eyes with tears, and saw that Irving was having difficulty attempting to flee as the wheels of his chair were locked, defendant assisted Irving into the bedroom in which the women had just taken refuge. Ms. Armstrong was still attempting to obtain police assistance by telephone at that time.

Defendant then returned to the front door, stepped outside for a moment, and then was pulled back in by Pam Burrell. Ms. Burrell had seen the grill strike defendant. When the window broke she heard "hollering and screaming" in the front room and believed because of the hammering and kicking on the door, and statements by the intruders that "this is how you get in here," that they were going to break in. The sound from the balcony was like "thunder." Frightened she had run to the bedroom and returned to the living room with her purse in which she carried a .25 caliber Italian Burretta automatic pistol. As she pulled defendant back into the living room she handed him the gun and began looking for a stick with which to protect herself. At the time she pulled defendant back into the room he appeared to be afraid, not angry.

Defendant testified that he was shocked and frightened when the hibachi came through the window. Within one to two minutes he had assisted Benny Irving to the bedroom and returned to the living room where people were screaming. The women were crying for someone to "do something," and several people were still fighting on the porch. After he looked out, defendant wanted to close the door and remain uninvolved. He was both "scared" and limited by a "bad back." He had waited in hope that the police would arrive, but when Ms. Burrell handed him her pistol he took it because she appeared to be frightened. He personally was "scared" then and he feared that if anything happened to him Ms. Burrell would use the gun.

Defendant stepped outside again, fired three shots into the air and warned the intruders to leave. He intended to disperse the crowd and was "stunned" and frightened when, after retreating, the intruders turned and again ran up the stairs toward him following a shout by someone that he was firing blanks. He then fired over the heads of the oncoming men. At that time he believed he was in great danger. The intruders retreated a final time.

During the second incident, which took place within 30 seconds to a minute after defendant first fired the gun, Dennis Montgomery suffered a relatively minor gunshot wound. He came to the door, told defendant he had been shot, refused an offer of assistance, and was driven to a nearby hospital by a friend.

As a result of these events defendant was charged by information with two counts of assault with a deadly weapon in violation of section 245, subdivision (a), and with the violation of section 12021. The jury, which had been instructed on self-defense, defense of habitation, and defense of others as to the first two counts,[3] returned a verdict of not guilty as to them. The court refused defendant's request that the jury be instructed that if they found that he acted in self-defense or defense of another defendant could be convicted of violating section 12021 only if the jury also found that he was in possession of the gun prior to using it in

[3]The jury was given the following instructions:

CALJIC No. 5.32, as modified: "It is lawful for a person who, as a reasonable person, has grounds for believing and does believe that bodily injury is about to be inflicted upon another to protect him from attack.

"In doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

CALJIC No. 5.42 (1974 Revision): "A person may defend his home or habitation against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or habitation and who appears to intend violence to any person in that home. The amount of force which the person may use in resisting such trespass is limited by what would appear to a reasonable person, in the same or similar circumstances, necessary to resist the violent or unlawful entry. He is not bound to retreat even though a retreat might safely be made. He may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances which are apparent to the homeowner are such as would excite similar fears and a similar belief in a reasonable person."

CALJIC No. 5.30: "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

CALJIC No. 5.51: "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an honest conviction and fear that he is about to suffer death or great bodily harm, and if a reasonable man in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if the person so confronted acts in self-defense upon such appearances and from such fear and honest convictions, his right of self-defense is the same whether such danger is real or merely apparent."

CALJIC No. 5.50: "A person who is threatened with an attack that justifies the exercise of the right of self-defense, need not retreat. In the exercise of his right of self-defense, he may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar

self-defense,[4] and refused to instruct that if the weapon was used only in a manner that reasonably appeared necessary to prevent imminent injury he was not guilty of violating that section.[5]

■ That petitioner had control of a concealable firearm as that term is used in section 12021 and that he was the person who used it was undisputed at trial. No evidence was presented that would have supported a finding that he possessed the weapon or had custody or control of it on or about August 10, 1975, at any time other than the period described above. Thus it is apparent that the conviction cannot stand if the trial court erred in refusing to instruct the jury regarding the right of self-defense as it related to the section 12021 charge.

The People suggest that the evidence did not require that instructions be given on self-defense, and that the acquittal of defendant on the assault charges might not reflect an acceptance of that defense by the jury, but rather a finding that defendant did not intentionally fire the pistol at anyone. We need not speculate as to the basis of the jury verdict, however, as it is clear that if self-defense may be urged in defense of a charge of violating section 12021, the evidence in this case required that such instructions be given.

We shall first consider whether in prohibiting possession of a concealable firearm by a person previously convicted of a felony the Legislature intended to preclude the assertion of self-defense, and the closely related defenses of defense of others and defense of habitation, to a charge of violating section 12021. For convenience we shall use the term "self-defense" only although our consideration is relevant to all of these defenses.

---

knowledge; and he may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

[4]The requested instruction stated: "If you find that William Harris King acted in self-defense, or in defense of another, then in order to find him guilty of a violation of Section 12021 of the Penal Code (possession of a concealable firearm by a felon) you must find that he had possession, custody or control of such firearm prior to the transaction or occurrence in which he acted in self-defense."

[5]The requested instruction stated: "If a person, as a reasonable man, has grounds for believing and does believe that he is about to suffer bodily harms [sic], and he grabs a weapon to defend himself, and uses this weapon only as would appear necessary to a reasonable person to prevent the injury which appears to be imminent, then this person is not guilty of being a felon in possession of a concealed [sic] weapon as prohibited by Penal Code Section 12021."

## THE HISTORY OF PENAL CODE SECTION 12021

Legislation prohibiting possession of concealable firearms was first adopted in 1923. As enacted the statute from which section 12021 is derived provided: "On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms 'pistol,' 'revolver,' and 'firearms capable of being concealed upon the person' as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years." (Stats. 1923, ch. 339, § 2, p. 696.)

Promptly challenged as denying equal protection to aliens, the law was upheld by this court as a proper exercise of the police power in *In re Rameriz* (1924) 193 Cal. 633 [226 P. 914, 34 A.L.R. 51]. In so holding the court found: "The purpose of the act is to conserve the public welfare, to prevent any interference with the means of common defense in times of peace or war, to insure the public safety by preventing the unlawful use of firearms. It cannot be assumed that the legislature did not have evidence before it, or that it did not have reasonable grounds to justify the legislation, as, for instance, that unnaturalized foreign-born persons and persons who have been convicted of a felony were more likely than citizens to unlawfully use firearms or engage in dangerous practices against the government in times of peace or war, or to resort to force in defiance of the law." (193 Cal. at p. 650.) In an observation that continues to be pertinent, and is relevant to our consideration here, the court observed that "it is not strictly true that the legislation here in question is prohibitory to every class of firearms. Under the statute aliens may own or have in their possession firearms, provided they are not of a size capable of being concealed on the person. This would permit aliens to have shotguns, rifles, or other large weapons for all lawful purposes." (*Id.,* at p. 646.) It was the law then, as it is now, that in appropriate circumstances deadly force, including the use of firearms, in self-defense is lawful. (§§ 692-694, 197, 198; *People* v. *Roe* (1922) 189 Cal. 548 [209 P. 560]; cf. *People* v. *Ceballos* (1974) 12 Cal.3d 470 [116 Cal.Rptr. 233, 526 P.2d 241].)

The 1923 statute was codified as section 12021, part of the Dangerous Weapons Control Law adopted by the Legislature in 1953. (Stats. 1953, ch. 36, § 1, p. 654.) The only significant change in its prohibitory provisions was the inclusion of narcotics addicts among the classes of persons forbidden to possess concealable firearms. After the prohibition had been held unconstitutional as applied to aliens (*People* v. *Rappard* (1972) 28 Cal.App.3d 302 [104 Cal.Rptr. 535]), a 1974 amendment removed aliens from the scope of the section (Stats. 1974, ch. 1197, § 1, p. 2588). The prohibitory provisions of the section have remained otherwise unchanged since its enactment.

### THE SCOPE OF SECTION 12021

When enacting section 12021 and its predecessor statute, the Legislature is presumed to have been aware of the several existing statutes giving any person the right to use force, including deadly force in appropriate circumstances, in defense of self or others. This right has been included in provisions of the Penal Code since its enactment in 1872. Section 692 provides: "Lawful resistance to the commission of a public offense may be made:

"1. By the party about to be injured;

"2. By other parties."

Section 693 provides: "Resistance sufficient to prevent the offense may be made by the party about to be injured:

"1. To prevent an offense against his person, or his family, or some member thereof.

"2. To prevent an illegal attempt by force to take or injure property in his lawful possession."

Section 694 extends the right to defend others, providing: "Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense."

Although the extent of these rights has been defined and circumscribed by judicial decision (see, e.g., *People* v. *Ceballos, supra,* 12 Cal.3d 470) none of these sections has been amended to restrict the rights affirmed therein since its adoption over a century ago.

Civil Code section 50, affirms the same rights, providing: "Any necessary force may be used to protect from wrongful injury the person or property of oneself, or of a wife, husband, child, parent, or other relative, or member of one's family, or of a ward, servant, master, or guest." It, too, was adopted in 1872, and it was amended in 1874 to expand the right of defense first declared to encompass guests. Similarly the provisions of sections 197 and 198 governing the circumstances in which homicide is justifiable were included in the Penal Code of 1872, and are traceable to the Statutes of 1850.

Section 12021 does not expressly conflict with any of these provisions and thus does not demonstrate a legislative intent to supersede or repeal them with respect to a felon's right to self-defense. ■ Accepted principles of statutory construction disfavor repeal by implication and compel wherever possible a construction that does not lead to absurd consequences. (*Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].) ■ Provisions of the Penal Code are "to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (§ 4.) "Where the statute is susceptible of two reasonable constructions . . . defendant is ordinarily entitled to that construction most favorable to him." (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 488 [134 Cal.Rptr. 630, 556 P.2d 1081].)

With these principles in mind, we note that the Legislature has not denied felons the right to possess or use weapons other than firearms, or the right to use firearms which are not concealable on the person. Thus we cannot infer that the Legislature intended absolutely to deny felons the rights declared in sections 692, 693, 694, and 197 and in Civil Code section 50. ■ In construing section 12021, therefore, we must reconcile its prohibition of possession of a concealable firearm with those statutes declaring the right of any person to use even deadly force in self-defense. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 274, fn. 7 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Modesto Irr. Dist.* v. *City of Modesto* (1962) 210 Cal.App.2d 652, 656 [27 Cal.Rptr. 90].) In so doing, we must assume in the absence of an express legislative direction to the contrary in section 12021, that the Legislature did not intend that section to restrict a felon's right of self-defense except to the extent necessary to fulfill the legislative purpose that persons affected by section 12021 not have concealable firearms readily available lest the weapons be used for crimes of violence or other unlawful purposes. (See *People* v. *Booker* (1978) 77 Cal.App.3d 223 [143 Cal.Rptr. 482]; *People* v. *Dubose* (1974) 42 Cal.App.3d 847 [117 Cal.Rptr. 235].)

Use of a concealable firearm in self-defense is neither a crime nor an unlawful purpose. Section 12021 was not therefore enacted to prevent possession of these firearms during such use. The People concede that felons have the right to use deadly weapons other than concealable firearms in self-defense in those circumstances in which any other person could lawfully do so. They also concede that felons may possess firearms not capable of being concealed on the person, and may use these weapons in self-defense. It would be unreasonable and would lead to absurd results to construe section 12021 as permitting the use of a shotgun, but proscribing the use of a small caliber pistol in self-defense, and thus forcing the felon to use only a weapon capable of inflicting greater injury if he is forced by circumstances to use deadly force in self-defense. ■ We conclude, therefore, that the prohibition of section 12021 was not intended to affect a felon's right to use a concealable firearm in self-defense, but was intended only to prohibit members of the affected classes from arming themselves with concealable firearms or having such weapons in their custody or control in circumstances other than those in which the right to use deadly force in self-defense exists or reasonably appears to exist. ■ Thus, when a member of one of the affected classes is in imminent peril of great bodily harm or reasonably believes himself or others to be in such danger, and without preconceived design on his part a firearm is made available to him, his temporary possession of that weapon for a period no longer than that in which the necessity or apparent necessity to use it in self-defense continues, does not violate section 12021. As in all cases in which deadly force is used or threatened in self-defense, however, the use of the firearm must be reasonable under the circumstances and may be resorted to only if no other alternative means of avoiding the danger are available. In the case of a felon defending himself alone, such alternatives may include retreat where other persons would not be required to do so.

This conclusion is entirely consistent with and is supported by our decision in *People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383], that possession of a concealable weapon by an alien or a felon is not in the abstract an inherently dangerous act, and that "it cannot be said that a person who has committed a [nondangerous felony], when he arms himself with a concealable weapon, presents a danger to human life . . . significantly more extreme than that presented by a nonfelon similarly armed . . . ." (6 Cal.3d at p. 40). This observation and the fact that the section draws no distinction among categories of felonies, or between recent and remote convictions supports our conclusion that the Legislature did not by enacting section 12021 contemplate

denying all persons whose prior felony could not reasonably be considered an indicator of dangerous propensities the right to defend themselves or others from *imminent* peril by use of any available weapon. We recognized in *Satchell* that the Penal Code "renders felonious many activities which do not indicate a propensity for dangerous acts." (*Id.,* at p. 40, fn. 19.) Construing section 12021 to deny felons any right to use a concealable firearm would not therefore further the legislative purpose. (Cf. *People* v. *Mijares* (1971) 6 Cal.3d 415 [99 Cal.Rptr. 139, 491 P.2d 1115].)

The People rely on *People* v. *Evans* (1974) 40 Cal.App.3d 582 [115 Cal.Rptr. 304], for the proposition that any use of a concealable weapon by a felon, even in self-defense is proscribed by section 12021. *Evans,* however, did not hold that use only in self-defense is the type of possession, custody or control prohibited by section 12021. The court found it unnecessary to reach that question, or the defendant's additional claims that so construed the statute denied a right of self-defense guaranteed by article I, section 1, of the California Constitution; denied his right to bear arms under the Second Amendment to the United States Constitution; and denied him equal protection as compared with prisoners who, the appellant claimed, were entitled to assert the defense to a charge of violating section 4502.[6] In *Evans* the court held at the outset that the theory of self-defense was irrelevant inasmuch as the defendant had armed himself prior to the shooting incident, noting that what had occurred in that case was "the very thing the Legislature was seeking to prevent . . . ' "*to minimize the danger to public safety arising from the free access to firearms that can be used for crimes of violence.*" ' " (40 Cal.App.3d at p. 586.) To the extent that dictum in *Evans* suggests that a felon may not in any circumstance use firearms in exercising his right of self-defense, it is disapproved.

---

[6]Section 4502 provides: "Every person confined in a state prison or who, while being conveyed to or from any state prison or while at any prison road camp, prison forestry camp, or other prison camps or prison farms or while being conveyed to or from such place or while under the custody of prison officials, officers or employees, possesses or carries upon his person or has under his custody or control any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles or any explosive substance or any dirk or dagger or sharp instrument, or any pistol, revolver or other firearm, is guilty of a felony. . . ."

In light of our decision that use of a concealable firearm in self-defense, without evidence of prior possession or control, is not proscribed by section 12021, we do not reach the additional claims made by defendant here that due process and equal protection considerations require recognition of a limited right of self-defense, nor the related claim that such a right is recognized as a defense to violation of section 4502.

## SUFFICIENCY OF THE EVIDENCE TO REQUIRE
## INSTRUCTIONS ON SELF-DEFENSE

By statute reflecting the common law a person may use "resistance sufficient to prevent" an offense against his person (§ 693) or another (§ 694), and may even use deadly force "when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished" (§ 197, subd. 3.), if the circumstances are "sufficient to excite the fears of a reasonable person." (§ 198.) ▮▮▮ The evidence here that defendant was located in an apartment from which no safe egress was possible; that a group of intruders was attempting to violently force entry into the apartment; that the nature of this assault was such as to have caused fear and near hysteria among other persons in the apartment who lacked the capacity to defend themselves; that the defendant was personally afraid and believed he was in great danger; and that the defendant shot only to frighten and not in an attempt to kill the intruders, satisfy all of the statutory criteria for an acquittal of a charge of assault, battery, or even homicide since a jury could find the fears reasonable and the force not excessive under the circumstances. A fortiori, if the defendant had a right to instructions on self-defense as a defense to the assault with a deadly weapon charges, he had a right to an instruction that if his possession of the weapon in question was solely for the purpose of self-defense, and was not preplanned, and did not continue beyond the existence of the circumstances giving rise to the right to self-defense, that possession was not proscribed by section 12021.

Properly instructed as to the section 12021 count the jury might have found that defendant's brief use of the concealable weapon was reasonable under the circumstances, and that he did not come into possession of the pistol he used prior to the exigency which made its use reasonably appear to be necessary. That he attempted to frighten the intruders or warn them by firing warning shots does not compel a different conclusion. It would surely be unreasonable to hold that a person with the ability and apparent necessity to use deadly force to repel intruders or defend himself and/or others, loses that right if he first attempts to frighten the would-be assailants.

Inasmuch as defendant's brief use of a concealable firearm, without predesign or prior possession of the weapon, in the exercise of the right to self-defense, defense of others, or defense of habitation would not constitute the possession, custody, or control of the firearm which the

Legislature has prohibited in section 12021, it was error for the court to fail to instruct the jury regarding the relevance of these defenses to the 12021 charge. As the factual questions that would have been posed by the omitted instructions were not resolved adversely to defendant under the instructions that were properly given, he has been denied his right to have the jury determine substantial issues material to his guilt. (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 720-721.)

The judgment is reversed.[7]

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., and Newman, J., concurred.

**CLARK, J.,** Dissenting.—The majority hold that an ex-felon may possess a concealable firearm in the course of defending himself. The majority thus legislate an exception to Penal Code section 12021. They argue that since the statutory right of self-defense existed when section 12021 was adopted, we must presume the Legislature did not intend to deny ex-felons the "right" to resort to concealable firearms for self-defense. But this argument seeks to prove too much. It suggests, for example, that an ex-felon may lawfully possess a machine gun in the course of defending himself, for the statute prohibiting possession of that weapon (Pen. Code, § 12220) likewise was enacted after the right of self-defense received statutory recognition in California. It must be obvious that it is the later expression of legislative intent—here the unqualified prohibition of possession of a concealable weapon by an ex-felon—which controls any earlier statutory authorization to take possession of such a weapon. (See *Coker* v. *Superior Court* (1945) 70 Cal.App.2d 199, 201 [160 P.2d 885].)

---

[7]Defendant filed an original petition for writ of habeas corpus in the Court of Appeal in conjunction with his appeal, claiming that he had not received constitutionally adequate representation by trial counsel. The Court of Appeal ordered the petition consolidated with the appeal and denied the writ in its order affirming the judgment. Our order granting the petition for hearing directed that the petition for writ of habeas corpus also be transferred to this court. It now appears, however, that the Court of Appeal did not issue an order to show cause. Therefore, the order denying the writ became final immediately after filing (Cal. Rules of Court, rule 24(a)), and the petition for hearing was untimely as to the petition for writ of habeas corpus. (Cal. Rules of Court, rule 28(b).) Since the order of the Court of Appeal denying the petition for writ of habeas corpus in *In re King* (1 Crim. 17278) had become final prior to our transfer of the consolidated proceeding to this court (rule 28(a)), that order was unaffected by the granting of the hearing. No further action need be taken in the habeas corpus matter, which in any event is rendered moot by the reversal of the judgment.

Moreover, when the Legislature intends to provide a self-defense exception to a weapons control statute, it says so. Penal Code section 12031, subject to stated exceptions, prohibits carrying a loaded firearm in certain places. Subdivision (j) of section 12031 provides: "Nothing in this section is intended to preclude the carrying of any loaded firearm, under circumstances where it would otherwise be lawful, by a person who reasonably believes that the person or property of himself or another is in immediate danger and that the carrying of such weapon is necessary for the preservation of such person or property." Absence of an analogous provision in section 12021 compels the conclusion that a self-defense exception was not intended.

The Legislature provided no such exception for apparent good reason. Just as ex-felons cannot be expected to properly use concealable firearms under ordinary circumstances, neither can they be expected to exercise sound judgment and self-restraint in the necessarily explosive situations giving rise to the right of self-defense. Moreover, granting ex-felons the right to use concealable firearms in purported self-defense must encourage them to abuse that right by possessing, or having ready access to, such weapons in anticipation of events justifying their use. This very case demonstrates the likelihood of such abuse. The other 30 to 40 guests responded to the intruders by attempting to reason with them, by engaging them in fistfights, by fleeing from the party or by calling the police. Only defendant saw fit to escalate the violence by using a firearm. By carrying the pistol to the party in her purse, furnishing it to defendant when the occasion arose,[1] and then retrieving it from him after he shot someone, defendant's companion demonstrated the ease with which the rule announced today will be manipulated.

I would affirm the judgment.

---

[1]The record clearly supports a finding that defendant took possession of the weapon well before he was called upon to use it in his purported self-defense. At the moment of taking possession he was guilty of a violation of section 12021, regardless of whether he later used the gun in self-defense. (*People* v. *Evans* (1974) 40 Cal.App.3d 582 [115 Cal.Rptr. 304].) The majority improperly decline to defer to the necessarily implied finding requiring affirmance of the judgment.