[Crim. No. 20765. Sept. 14, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE WAYNE PENDLETON II, Defendant and Appellant.

In re GEORGE WAYNE PENDLETON II on Habeas Corpus.

**COUNSEL**

Corinne S. Shulman, under appointment by the Supreme Court, for Defendant and Appellant and Petitioner.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Lawrence P. Scherb II, William R. Pounders and Sandy R. Kriegler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CLARK, J.**—Defendant was convicted of first degree burglary (Pen. Code, §§ 459, 460), kidnaping (Pen. Code, § 207) and rape (Pen. Code, § 261). He was sentenced to state prison for the term prescribed by law on each count, the terms to run concurrently. Execution of sentence on the kidnaping and rape counts was stayed pending appeal, the stay to become permanent upon completion of the burglary term. The judgment will be affirmed.

Defendant makes three contentions on appeal. 1. The trial court committed prejudicial error in admitting evidence of defendant's prior

sex offenses, and in instructing the jury concerning the limited purposes for which the evidence might be considered. 2. Defendant was denied effective assistance of counsel at trial because he was represented by a partner in a law firm which acted as city attorney for another community and, although defendant's attorney did not, other members of the firm exercised prosecutorial responsibilities in behalf of that community. (See Gov. Code, § 41805; *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363].) 3. The trial court erred in refusing defendant's request to instruct the jury on unauthorized entry (Pen. Code, § 602.5) as a lesser offense included within the crime of burglary. In his habeas corpus petition, which the Court of Appeal consolidated with the appeal, defendant simply repeats his *Rhodes* argument, supporting his allegations with evidence outside the record on appeal.

## Charged Offenses

Kathy D. and Cindy H. were approached by defendant, an acquaintance of Cindy's, in a college snack bar. Cindy introduced him to Kathy. Later that evening, again encountering Cindy, defendant asked her whether she could arrange a date for him with Kathy. When Cindy replied that Kathy had a boyfriend defendant appeared disappointed, stated "I want to be all she thinks about," and gave Cindy his card to pass along to Kathy. Cindy remarked that defendant lived on the same street as Kathy.

One afternoon two days later, without having knocked or otherwise requested admission, defendant appeared in the living room of the apartment Kathy shared with Marcia T. He gave Kathy a rose and asked her to accompany him to a nearby beach. When Kathy declined defendant became very insistent, but finally departed, saying they would get together another time.

Two weeks later Kathy and Marcia retired for the evening, locking the front door of the apartment and closing the doors of their separate bedrooms. During the very early hours of the morning Kathy heard her bedroom door open. The intruder, whom she recognized as defendant, walked over to her bed, sat down and kissed her, saying he wanted to take her somewhere and talk. When Kathy replied she was not going anywhere with him defendant began choking her, saying that if she did not go willingly he would knock her out and take her anyway. Believing she would be incapable of physically resisting defendant, as he is very large and muscular, Kathy agreed. As Kathy got out of bed defendant

picked her up and warned her not to make any noise. He then carried her to his car, drove to his nearby house and there twice forcibly raped her.

*Prior Offenses*

Defendant admitted entering Kathy's bedroom while she was sleeping, driving her to his house and there engaging in sexual intercourse with her. However, he claimed he knocked on the front door of Kathy's apartment, thought he heard someone invite him in, and found the door unlocked. He denied having entered the apartment with intent to rape or kidnap Kathy, claiming instead that her conduct led him to believe she accompanied him willingly and willingly had intercourse with him. As defendant placed his intent in issue, the trial court admitted evidence of his prior sexual offenses against Clarice S. and Kathleen G., instructing the jury they might consider the evidence not only on the question whether defendant entered Kathy's apartment with intent to commit rape but also in testing Kathy's credibility.

Three years prior to the present incident, Clarice S. woke up early one morning to find defendant caressing her face. She asked him who he was and how he had gotten in the locked house. Defendant grabbed her, saying he wanted to make love to her. When Clarice tried to run defendant tackled her, falling to the floor on top of her. As defendant straddled Clarice her daughter ran at him with a pogo stick, causing him to flee.

Four years prior to the present incident, Kathleen G. was awakened early one morning by the sound of a window being opened. As Kathleen was dialing the police the intruder, defendant, told her to put down the phone, adding that he would not hurt her if she gave him what he wanted. Kathleen replied that defendant could take her money and valuables. He responded by throwing Kathleen to the floor and sitting on her while choking and slapping her. He tore her robe at the shoulder. Kathleen was "struggling to get away, screaming, scratching, biting him, anything [she] could." During the struggle a car drove into the alley, prompting defendant to flee.

I

The general principles concerning the admissibility of evidence of prior offenses in sex offense cases were exhaustively restated in *People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433], and need

not be repeated to properly frame the issues here. ■ Defendant simply contends his prior offenses were not sufficiently similar to the present offense to render evidence concerning them admissible on the issue of intent. This contention clearly lacks merit.

The offenses against Kathy, Clarice and Kathleen were similar in the following significant respects: (1) the entry into the victim's residence was unauthorized; (2) the exterior doors of the victim's residence had been locked; (3) the entry occurred during the early morning hours when the victim was asleep; (4) defendant spoke to the victim of himself and/or his parents; (5) defendant knew friends or relatives of the victim;[1] (6) defendant physically attacked the victim; and (7) none of the victim's property was taken. There were the following additional similarities between the offenses against Kathy and Kathleen: (1) the victim was in her late teens; and (2) defendant warned the victim not to report the incident to the police or friends.

■ Defendant further contends the evidence of his prior offense against Kathleen did not support the conclusion he assaulted her with intent to commit rape, and thus did not tend to prove he entered Kathy's apartment with intent to commit rape. This contention also clearly lacks merit. "When a strange man enters a woman's bedroom, covers her mouth with his hand, grasps her wrist while she screams and kicks, releases her when she bites his hand, and makes no effort to take any property, it is reasonable to infer that he intended to commit rape . . . ." (*People* v. *Nye* (1951) 38 Cal.2d 34, 37 [237 P.2d 1]; see *People* v. *Dobson* (1970) 12 Cal.App.3d 1177, 1180-1181 [91 Cal.Rptr. 443].) Defendant, a stranger to Kathleen, entered her bedroom, told her she would not be hurt if she gave him what he wanted, attacked her when she offered him money and valuables, and, upon being frightened away, left without taking any property. Admittedly, defendant did not kiss Kathleen, remove her panties, touch her private parts or engage in certain other conduct commonly associated with attempted rape. However, his failure to do so tells us more about Kathleen's pluck than about defendant's intentions. When asked whether defendant "had the opportunity to do something sexual to you if he wanted to," Kathleen testified: "I would have to say no, not really, because I was fighting him the whole time."

---

[1] As previously stated, defendant was introduced to Kathy by Cindy H. He told Clarice he knew two of her brothers. He revealed to Kathleen that he knew one of her coworkers, and that he knew the coworker had returned to her husband after living for a while with Clarice.

Assuming for the sake of argument that the evidence of his prior offenses was admissible on the issue of his intent in committing the charged offense, defendant contends the jury should not have been instructed they could also consider that evidence in testing Kathy's credibility.

In *People* v. *Thomas, supra,* 20 Cal.3d 457, this court disapproved of several Court of Appeal cases insofar as they "suggest[ed] that evidence of prior sex offenses involving victims other than the prosecuting witness is generally admissible for the purpose of corroborating such witnesses *without regard to the remoteness of the prior offenses or the lack of close similarity to the charged offense." (Id.* at p. 468, italics added.) "Were the theory [of the disapproved cases] to be held applicable in *all* sex offense cases, without regard either to remoteness or similarity, the 'corroboration' exception," this court pointed out, "would absorb the general rule of exclusion in its entirety, permitting introduction of all prior sex offenses for purposes of corroborating the prosecuting witness." (*Id.* at pp. 468-469.) ■ However, this court reaffirmed the principle that "evidence of similar, nonremote offenses involving similar victims, declared admissible in [*People* v. *Kelley* (1967) 66 Cal.2d 232 (57 Cal.Rptr. 363, 424 P.2d 947)] and [*People* v. *Cramer* (1967) 67 Cal.2d 126 (60 Cal.Rptr. 230, 429 P.2d 582)] to show a common design or plan, may also assist in corroborating the prosecution witness' version of events." (*Id.* at p. 468.) The trial court's instructions here were not inconsistent with *Thomas.*

## II

Defendant's retained counsel at trial was Melvin de la Motte, Jr., a partner in the law firm of Wendt, Mitchell, Sinsheimer, de la Motte and Lilley. At the time of trial this firm was employed on a contract basis to act as city attorney for San Luis Obispo. Mr. de la Motte had previously informed the city council by letter that in order to continue to engage in the representation of persons accused of crime he would not act as a prosecutor for the city. However, the city had not relieved the firm of its prosecutorial responsibilities, and two members of the firm exercised such responsibilities while Mr. de la Motte was representing defendant. Although it was Mr. de la Motte's practice to obtain a written waiver of any potential conflict of interest arising from his relationship to the firm, he failed to do so here, and there is not evidence that defendant was aware of or waived the conflict.

This prosecution, it should be noted, was *not* maintained by the San Luis Obispo City Attorney. The offenses occurred in Pismo Beach, and

being felonies, were prosecuted by the San Luis Obispo County District Attorney's office.

In *People* v. *Rhodes, supra,* 12 Cal.3d 180, an indigent criminal defendant was represented under court appointment by the part-time City Attorney of Hanford. Reversing his conviction, this court declared, as a judicially declared rule of criminal procedure, "a city attorney with prosecutorial responsibilities may not defend or assist in the defense of persons accused of crime." (*Id.* at p. 187.) In *Sparks* v. *Superior Court* (1975) 45 Cal.App.3d 533 [119 Cal.Rptr. 441], *Rhodes* was interpreted as applying to retained as well as court-appointed counsel. (*Id.,* at p. 536.) In *Montgomery* v. *Superior Court* (1975) 46 Cal.App.3d 657 [121 Cal.Rptr. 44], the Court of Appeal, in applying the *Rhodes* proscription to the law partners of a city attorney, quoted an opinion of the Committee on Professional Ethics of the American Bar Association stating: " ' "The relations of partners in a law firm are such that *neither the firm nor any member or associate thereof may accept any professional employment which any member of the firm cannot properly accept." '* (Italics added.)" (*Id.* at p. 672, fn. 14.) However, the court went on to conclude that "the city attorney of a city which has validly divested him of prosecutorial responsibilities, or his professional associates in the practice of law, may defend or assist in the defense of any criminal action (1) in which personnel of the employing city are not involved in any significant respect and (2) in which the defendant has knowingly and intelligently waived any irregularity which might be perceived by reason of the *Rhodes* proscription . . . subject to appropriate exercise of the trial court's discretion in a particular case." (*Id.* at p. 674.)

Subsequent to the aforementioned cases, and prior to the present case, Government Code section 41805 was enacted, providing as follows: "(a) No city attorney who does not, in fact, exercise prosecutorial responsibilities on behalf of the city or cities by which he is employed shall be precluded from defending or assisting in the defense of, or acting as counsel for, any person accused of any crime except for violation of any ordinance of the city or cities by which he is employed, provided that: (1) The city or cities by which he is employed expressly relieve him of any and all prosecutorial responsibilities on its or their behalf; and (2) The accused has been informed of and expressly waives any rights created as a result of any potential conflict created by his attorney's position as a city attorney. (b) Where the above provisions are met, no partner or associate of a city attorney shall be prevented from defending or assisting in the defense of, or acting as counsel for, any person accused of any crime

except for violations of any ordinance of the city or cities by which his partner or associate is employed as a city attorney. This section shall not preclude any city from limiting or prohibiting the private practice of any attorney it retains or employs."

The People acknowledge they cannot prove compliance with section 41805 because the city had not relieved the law firm of its prosecutorial responsibilities as city attorney, and, moreover, there is no evidence defendant was aware of or expressly waived the conflict. ■ Therefore, as framed by the People, the question presented here is "whether a lack of compliance with Government Code section 41805 was reversible error per se under the facts of the instant case."

The error in *Rhodes* was impliedly held to be reversible per se. As the dissent pointed out, no actual prejudice was shown; indeed, as the majority acknowledged, the part-time city attorney "competently represented defendant throughout all phases of the trial." (12 Cal.3d at pp. 183, fn. 4, 188.)

The People seek to distinguish *Rhodes*, insofar as the standard of review is concerned, on the following grounds: Defense counsel in *Rhodes* was *the* city attorney and was responsible for prosecuting persons accused of violating city ordinances. Mr. de la Motte was a member of a firm which acted as city attorney and he had, in attempted compliance with Government Code section 41805, informed the city council by letter he would not act as prosecutor for the city. Moreover, although he failed to do so here, it was his practice to obtain a written waiver of any conflict of interest.

To assess the significance of these distinctions we review the "considerations of a practical nature" identified in *Rhodes* as having a "potentially debilitating effect on both the quality of the legal assistance rendered by a city attorney to criminal defendants and the ability of a city attorney to properly discharge his prosecutorial responsibilities." (12 Cal.3d at p. 183.) First, there is the potential conflict arising, on the one hand, from the absolute duty owed by a defense attorney to his client and, on the other hand, the rapport which a city attorney in his capacity as prosecutor must maintain with his law enforcement associates in the employ of his city and of neighboring communities. (*Id.* at pp. 183-184.) A related consideration is the public's interest in the successful prosecution of those guilty of crime. "If, because of a vigorous representation of a criminal defendant by a public prosecutor there results a weakening of assistance

provided by local and neighboring law enforcement agencies, the prosecutor's ability to enforce those criminal laws falling within the scope of his responsibilities as a city attorney would be severely undermined." (*Id.* at pp. 184-185.) A final consideration of compelling public policy: The actual or apparent incompatibility between a city attorney's roles as defense counsel and as public prosecutor may undermine the confidence the public must have in the absolute integrity and impartiality of our criminal justice system. (*Id.* at p. 185.)

The "detrimental effects engendered by the conflicting loyalties of defense counsel and public prosecutor" (*id.*) are not as severe in the situation presented by this case because the conflict is not as direct as it was in *Rhodes.* This may be illustrated by an example given in that case. "[C]ity police officers are the principal source of witnesses relied upon by a city attorney in prosecutions for violations of city ordinances. If these same police officers are witnesses in a case in which a city attorney is acting as defense counsel, he might be reluctant to engage in an exhaustive or abrasive cross-examination of such officers even though such might well be required." (12 Cal.3d at pp. 183-184.) Although other members of his firm do, Mr. de la Motte does not exercise any prosecutorial responsibilities for the city. Therefore, he is less likely than a city attorney having such responsibilities to "pull his punches" when cross-examining police officers. For the same reason any antagonism engendered by Mr. de la Motte's vigorous representation of persons accused of crime is less likely to affect the firm's ability to function as a prosecutor than would be the case if the members of the firm actually having prosecutorial responsibilities also engaged in criminal defense work. Finally, because Mr. de la Motte has formally withdrawn from prosecutorial responsibilities on behalf of the city and ordinarily obtains an express, written waiver of any conflict of interest, the public's confidence in the criminal justice system is less likely to be undermined by the situation presented by this case.

For the foregoing reasons, the rule that *Rhodes* error is reversible per se is not applicable in the circumstances of this case. There being no claim or showing of actual prejudice, the error is harmless.

### III

We turn now to the argument that the trial court erred in refusing defendant's request to instruct the jury on unauthorized entry (Pen. Code, § 602.5) as a lesser offense included within the crime of burglary.

■ " 'The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.' " (*People* v. *West* (1970) 3 Cal.3d 595, 612 [91 Cal.Rptr. 385, 477 P.2d 409], quoting *People* v. *Greer* (1947) 30 Cal.2d 589, 596 [184 P.2d 512].)

■ Defendant's argument rests on the premise that, in the language of section 602.5, entry "without consent of the owner, his agent, or the person in lawful possession" *is* a necessary element of the crime of burglary. This premise is false because "it is settled that the entry need not constitute a trespass" to support a burglary conviction. (*People* v. *Talbot* (1966) 64 Cal.2d 691, 700 [51 Cal.Rptr. 417, 414 P.2d 633], overruled on other grounds in *People* v. *Ireland* (1969) 70 Cal.2d 522, 540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

*People* v. *Gauze* (1975) 15 Cal.3d 709 [125 Cal.Rptr. 773, 542 P.2d 1365] does not hold to the contrary. The defendant in *Gauze* was convicted of burglary predicated upon his entry into his own apartment with intent to assault his roommate. The question presented was whether the defendant could be guilty of burglarizing his own home. We answered this question in the negative on the ground that one has an unconditional right to enter his own home, even for a felonious purpose. We did not overrule existing authority upholding burglary convictions in which there was consensual entry. The law after *Gauze* is that one may be convicted of burglary even if he enters with consent, provided he does not have an unconditional possessory right to enter.

■■■■ The judgment is affirmed. For the reasons stated in the margin, no further action need be taken in the habeas corpus matter.[2]

---

[2]This case is analogous to *People* v. *King* (1978) 22 Cal.3d 12 [148 Cal.Rptr. 409, 582 P.2d 1000]. The defendant in *King* filed an original petition for writ of habeas corpus with his appeal, claiming that he had not received constitutionally adequate representation by trial counsel. The Court of Appeal ordered the petition consolidated with the appeal and denied the writ in its order affirming the judgment. Our order granting the petition for hearing directed that the petition for writ of habeas corpus also be transferred to this court. We subsequently discovered, however, that the Court of Appeal had not issued an order to show cause. Therefore, the order of the Court of Appeal denying the writ became final immediately after filing (Cal. Rules of Court, rule 24(a)), and the petition for hearing was untimely as to the petition for writ of habeas corpus. (Cal. Rules of Court, rule 28(b).) Since the order of the Court of Appeal denying the petition for writ of habeas corpus had become final prior to our transfer of the consolidated proceeding to this court (rule 28(a)), that order was unaffected by the granting of the hearing. (*People* v. *King*, *supra*, 22 Cal.3d at p. 27, fn. 7.)

Here, as previously stated, the Court of Appeal consolidated defendant's original petition for habeas corpus with his appeal. As in *King*, no order to show cause was issued. However, rather than denying the petition, the Court of Appeal dismissed it in the order

Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Newman, J., concurred.

**BIRD, C. J.**—I respectfully dissent under the mandate of *People* v. *Rhodes* (1974) 12 Cal.3d 180 [115 Cal.Rptr. 235, 524 P.2d 363]. The error committed below is prejudicial per se and, therefore, the judgment must be reversed.

---

reversing the judgment. Therefore, if a dismissal order, like a denial order, becomes final immediately when no order to show cause has issued, then the petition for hearing was untimely as to the petition for habeas corpus.

The only reason for distinguishing between denial and dismissal in this respect would be to avoid trapping the unwary, for rule 24(a) does not mention dismissals. However, an opinion in this case will put future litigants on notice, and no harm will be done by applying the rule here for the only issue raised in the habeas petition is also raised in the appeal, and it is the People who petitioned for hearing. Accordingly, we hold that an order by a Court of Appeal dismissing a habeas corpus petition becomes final as to that court immediately after filing when an order to show cause has not issued.