[No. A029291. First Dist., Div. Five. Sept. 19, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE L. WHITE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication except for part II.

## COUNSEL

Jean R. Sternberg, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANING, J.**—Defendant/appellant Willie L. White appeals from a judgment on a jury verdict convicting him of two counts of first degree murder. (Pen. Code, § 187.) He contends the trial court erred by permitting the prosecution to try the case on the theory that he personally shot the victims, after a jury in a prior trial acquitted him of firearm use in connection with the charged homicides. He also contends the trial court erroneously refused to instruct on accessory after the fact (Pen. Code, § 32) as a lesser related offense. We conclude he is correct on both grounds, and reverse.

I

On March 28, 1979, two bodies were found in a vacant housing project in the Hunters Point district of San Francisco. Each victim had wounds from both a shotgun and a small caliber weapon. At the scene the police recovered a shotgun shell, two .25 caliber shell casings, and two shotgun power pistons.

The victims were identified as Phyllis Lamboy (aka Peanut) and Darryl Charles (aka D.C.); they lived together as husband and wife. The coroner testified that the arms of each victim bore fresh needle marks of approximately six hours or less in age, and toxicological studies on both victims revealed significant levels of amphetamine and methamphetamine in their bodies. He estimated the time of both deaths at about midnight, with a range of 8 p.m. on March 27, to 7 a.m. on March 28.

Phoebe Jane Williams lived in the neighborhood where the bodies were discovered. On March 27 she was home with her son, Homer Mathews, and his girlfriend, Lynn Harrell. At approximately 11 p.m., she heard two shots and tires squealing. When she looked out the window she saw a large, brown-appearing car driving away. She testified that the driver was a Black man with kinky hair and had a small head like appellant's. Homer Mathews testified that the shots occurred between 10:45 and 11 p.m. Lynn Harrell testified that she heard three or more shots.

Peanut's sister, Patricia, testified that she had seen the victims with appellant on three different occasions within two or three months of their deaths. Once while visiting the couple's home she saw appellant go upstairs

with D.C. When Patricia went upstairs to use the bathroom she passed a bedroom where she saw D.C. and appellant placing white powder in bags. They had the white powder on a mirror.

Debra Judkins, a neighbor of the victims, testified that she observed appellant speaking with the decedents in their home in February 1979. She heard appellant tell the couple, "I want my money, and I don't care how you get it."

Betty Jean McGlothlin became involved with appellant early in 1979. She occasionally stayed at his McKinnon Street apartment in San Francisco, and at other times he stayed at her home in Fremont, where her two daughters and invalid father also resided. She testified that appellant supported himself by selling drugs, namely, "speed." She stated that in March 1979 she accompanied appellant in an attempt to locate Peanut and D.C. because they owed money to appellant's brother, Robert White. She drove appellant in her blue and beige 1978 Ford LTD because appellant did not own a car and claimed he could not drive.

McGlothlin also testified that on the night of the murders she was staying at appellant's apartment, and dozed off after watching the 11 o'clock news with appellant. When she awoke later in the night she heard appellant and Robert talking at the foot of the bed. Robert was holding a shotgun which she had seen before in appellant's closet. When they left the bedroom she went back to sleep. Later, she awoke and saw appellant sitting at the foot of the bed cleaning the shotgun. He removed an expended shell from the gun and wiped it, commenting that "they can get fingerprints off of it." He discarded the shell in a paper bag and disposed of it in the garbage. He also removed live rounds from the gun, cleaned them and reinserted them. After cleaning the shotgun he placed it in the closet. When McGlothlin asked him where he had been, appellant replied "nowhere" and instructed her that "if anybody asked, he hadn't been anyplace." He added that what she "didn't know wouldn't hurt [her], wouldn't hurt [her] children and would not hurt [her] father." She also testified that appellant had other guns, including .25, .38 and .45 caliber handguns. On occasion she had carried these handguns for him in her purse.

On March 29 McGlothlin read a newspaper article describing the "execution style" shotgun murders of a man and a woman found in a Hunters Point housing project. When she read the article to appellant, he remarked, "things like that happen when you're in this game."

In April 1979 appellant was evicted from his San Francisco apartment. On April 11 McGlothlin took appellant's clothing to her Fremont home.

His other belongings went into the basement of the house of Earthel White, another of appellant's brothers. McGlothlin testified that when she asked about the shotgun appellant said he had taken it with the linen they had delivered to Earthel's home.

Beginning March 18, 1979, the relationship between McGlothlin and appellant began to deteriorate. On May 3 McGlothlin called the Richmond police when appellant took her disability checks and her car, after he insisted she sign over the checks to him and she refused. She also reported her suspicions that appellant had been involved in the double murder in San Francisco. McGlothlin testified that she did not contact the police sooner about her suspicions because of her fear for her own life, and the lives of her children and her father.

The Richmond police contacted the San Francisco Police Department. Inspectors from the San Francisco Homicide Detail spoke to McGlothlin the same day. Based on the information received from McGlothlin, they obtained a search warrant for Earthel White's basement. There they found the shotgun. Ballistics examinations established that the shotgun was one of the two firearms used in the murders.

Appellant was charged by information with two counts of murder (Pen. Code, § 187), with use of a firearm (Pen. Code, § 12022.5), and two counts of possession of a firearm by a person previously convicted of firearm use during the commission of a felony. (Pen. Code, § 12560.) In his first trial, he was found guilty of two counts of first degree murder and firearm possession, but the jury found the firearm use allegations not true. On appeal, another division of this court reversed the murder convictions based on improper admission of hearsay testimony, and affirmed the judgment in all other respects. (*People* v. *White,* A011486.)

Appellant contends the trial court erred by denying his motion to prohibit the prosecution from proceeding on the theory that he fired the fatal shots. He argues that because the jury in his first trial found the personal use of a gun (Pen. Code, § 12022.5) not true, the principles of collateral estoppel and res judicata prohibited his prosecution in the second trial as the actual killer.

In *Sealfon* v. *United States* (1948) 332 U.S. 575, 578 [92 L.Ed. 180, 184, 68 S.Ct. 237] the United States Supreme Court held that the "doctrine [of res judicata] applies to criminal as well as civil proceedings . . . ." *Ashe* v. *Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469, 90 S.Ct. 1189] determined that collateral estoppel was not only a requirement of due process, but included within "the Fifth Amendment's guarantee against

double jeopardy." (*Id.*, at pp. 442, 445 [25 L.Ed.2d at pp. 475, 476]; see also *United States* v. *Mespoulede* (2d Cir. 1979) 597 F.2d 329; *Wallace* v. *Havener* (6th Cir. 1977) 552 F.2d 721.)

In *People* v. *Asbury* (1985) 173 Cal.App.3d 362 [218 Cal.Rptr. 902], the collateral estoppel doctrine was invoked to reverse a murder conviction which was based on facts decided favorably to the defendant in a prior trial. The defendant in *Asbury* was originally charged with murder and robbery with a special circumstance allegation that the murder occurred during the course of the robbery. Allegations that defendant used a deadly weapon and inflicted great bodily injury were also charged. Defendant was convicted of first degree murder and robbery; the jury also found that he used a deadly weapon during the murder, but not during the robbery, and that he had not inflicted great bodily injury during the robbery. The conviction was reversed for unrelated reasons.

Upon retrial the defendant was again convicted of first degree murder and robbery on a felony murder theory, the trial court having ruled the evidence insufficient to support premeditation. On appeal from the second conviction the Court of Appeal stated the problem: "In finding the defendant guilty of first degree murder, therefore, the jury necessarily adopted the felony-murder theory and determined that the murder had occurred during the course of the robbery—a finding in apparent conflict with the verdict in the earlier proceeding rejecting the robbery special circumstance allegation and the allegations of deadly weapon use and infliction of great bodily injury during the robbery." (*People* v. *Asbury, supra,* 173 Cal.App.3d at p. 365.) The Court of Appeal then held that the "felony-murder conviction is barred by the doctrine of collateral estoppel, as the original jury, in finding the special circumstance not true, necessarily rejected the notion that the murder occurred during the course of the robbery." (*Ibid.*)

The doctrine of collateral estoppel prevents the relitigation of issues decided between the parties in earlier proceedings upon which a judgment on the merits of the issues has become final. (*People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321]; *People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622].) In the instant case, the issue of appellant's use of a gun in the commission of these particular homicides was litigated between the parties and decided finally in appellant's favor in the first trial. In the second trial the prosecution sought to relitigate the same issue. It argued that appellant was guilty of murder if he was "the actual perpetrator, that it was Mr. Willie White out there who pulled the trigger on one of the firearms or both of them that killed these people." Appellant's use of a gun was resolved adversely against the prosecution in the first trial, and should not have been relitigated in the second. The

prosecution is not prevented from proceeding on the theory that appellant supplied the weapons or otherwise participated as a principal. (See Pen. Code, § 31.) What it cannot do is relitigate the fact of appellant's *use* of a gun in these homicides, since that issue was decided against it in the first trial. Principles of double jeopardy and due process which incorporate the doctrine of collateral estoppel preclude such action.

Respondent contends Penal Code section 954 permits it to retry the issue of gun use. That section states, in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court . . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count."

We reject this contention for two compelling reasons. First, a statutory enactment cannot override the constitutional prohibitions against double jeopardy. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) Second, Penal Code section 954 is concerned with multicount indictments or informations, and not with the retrial of issues previously adjudicated to finality. The reason is well expressed in *United States* v. *Mespoulede, supra,* 597 F.2d at pages 336-337, discussing the similar federal rule: "We tolerate inconsistencies in unified jury verdicts in criminal cases, not because of any singular virtue we attribute to inconsistency, but rather out of deference to the nature of the jury and the role it plays in our jurisprudence. There is no question but that a jury in a criminal trial has the power to render a verdict of acquittal that is wholly at odds with the law and the facts. As we pointed out in *United States* v. *Maybury,* 274 F.2d 899, 902 (2d Cir. 1960), this notion has its roots in the fact that the jury was originally conceived of as 'inscrutable.' Although we no longer believe that a jury's pronouncements must be accepted as unquestioningly as the results of an ordeal by cold water or an oath of compurgation, *see* T. Plunkett, *A Concise History of the Common Law* 115-16 (5th ed. 1956), an 'arbitral' element of jury decision-making survives. We recognize that the jury is in a sense the conscience of the community and can, for example, render a verdict to mitigate an overly severe punishment. *United States* v. *Maybury, supra,* 274 F.2d at 902. Similarly, in compromising in order to reach a unanimous verdict, a jury is often fulfilling its role as a cross-section of the community that it is supposed to represent. Occasional anomalies are the price of unanimity. *Id.,* at 903. [¶] Internal inconsistency, then, is not an end in

itself, and it would be irrational to expand gratuitously the judicial tolerance of inconsistent verdicts to permit different juries in successive trials to reach contradictory results. Allowing a second jury to reconsider the very issue upon which the defendant has prevailed serves no valuable function. To the contrary, it implicates concerns about the injustice of exposing a defendant to repeated risks of conviction for the same conduct, and to the ordeal of multiple trials, that lie at the heart of the double jeopardy clause." (Fn. omitted.)

Thus, it was clearly erroneous to permit the prosecution to retry the case on the theory that appellant used a firearm, since the previous jury had decided that issue and acquitted him of that charge. "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].)

Appellant also contends the trial court erred in refusing to instruct the jury on accessory after the fact as a lesser related offense to the charge of murder. ■ In *People* v. *Geiger* (1984) 35 Cal.3d 510, 531-532 [199 Cal.Rptr. 45, 674 P.2d 1303], the Supreme Court set forth three prerequisites to instructions on related, but not necessarily included, offenses. First, there must be "some basis, other than an unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged." (*Id.*, at p. 531.) Second, "the offense must be one closely related to that charged and shown by the evidence." (*Ibid.*) Third, "the instructions must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related offense. Thus, the instruction need not be given if the defense theory and evidence reflect a complete denial of culpability as when the defense is alibi, or the only issue is identity, unless the defendant argues that the evidence at most shows guilt only of the related offense." (*Id.*, at pp. 531-532.) Also, "'[t]he court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.' [Citation.]" (*People* v. *Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1].)

■ Based on the facts in this case appellant was entitled to an accessory instruction. There was no admission, confession or other direct evidence of appellant's actual participation in the homicides. The case against him was strictly circumstantial. Appellant's theory was that, at best, the prosecution had established his guilt as an accessory after the fact under Penal Code section 32. In support thereof he cites the testimony of Homor Mathews that the shots were fired at 10:45 p.m., at which time Betty Jean McGlothlin testified appellant was with her. He also points to evidence that he did not

or could not drive, and therefore could not have been the person Phoebe Williams saw driving away after the shots were fired. The evidence that he was seen in the company of his brother cleaning a gun after the shootings inferentially occurred is entirely consistent with his complicity as an accessory after the fact. His attorney argued to the jury that the evidence would only sustain a conviction as an accessory, but he was without benefit of jury instructions upon which to base his defense.

Penal Code section 1093 requires the trial court to instruct the jury on "any points of law pertinent to the issue[s]." Based on our review of the entire record (see *People* v. *King* (1978) 22 Cal.3d 12, 15-16 [148 Cal.Rptr. 409, 582 P.2d 1000]) we conclude that *Geiger* mandates the requested instruction on accessory after the fact. (See also *People* v. *Flannel, supra,* 25 Cal.3d at p. 684.) Even if there were any doubt whether the evidence warranted the instruction, "[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. Such a rule assures compliance with the rules laid down in section 1093 of the Penal Code." (*People* v. *Wilson* (1967) 66 Cal.2d 749, 763, fn. omitted [59 Cal.Rptr. 156, 427 P.2d 820].)

## II*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## III

The judgment is reversed and remanded for further proceedings consistent with this decision.

Low, P. J., and King, J., concurred.

---

*See footnote, *ante,* page 822.