[Crim. No. 36882. Second Dist., Div. Five. Oct. 8, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM BRYON McDONALD, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Robert Scarlett, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Richard L. Walker, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Defendant was charged with the nighttime burglary of the home of Charles W. Rubin on July 7, 1979. After a jury trial he was found guilty as charged and sentenced to prison. He appeals.

FACTS

Charles Rubin lived at 1707 Corning, Los Angeles. He retired at about 11 p.m. on July 6, 1979 and was awakened between 4:30 and 5 a.m. on July 7 when he heard footsteps coming over a chain link fence. This was followed by an announcement: "This is the police. We've got the house surrounded. Come out with your hands up." He then heard someone say "Okay. Okay. I'm coming out." Rubin never saw the apparent burglar. He did, however, meet with the police and they went through the house together. Everything was in order except for a slit in the screen near a window latch in the second bedroom. In the living room Rubin found two screwdrivers and a flashlight which were not his. There was no evidence of ransacking.

At the trial Rubin further testified that he had never met defendant before and had not given him permission to be in his home that night or at any other time.

The reason the police action had been so efficient was that officers had actually observed defendant entering the Rubin residence. They then ordered him out, as overheard by Rubin. According to one officer when defendant emerged he said: "Damn, I didn't know there was anybody at home. I had checked the garage and the bedroom was empty when I went in." He was placed under arrest. A pair of gloves was recovered from his coat pocket. He later stated that he had been looking for money or anything that he could sell for the purpose of buying a ticket to fly back east to his ailing mother.

Defendant testified in his own defense: He lived at 710 South Broadway. Sometime after midnight on July 7 he received a call from two friends—Paul and Mary Lambert—who were living in the general area of the Rubin residence. Mr. Lambert asked him to assist him with a stalled car—a service he had rendered once before. Lambert wanted to get the car fixed before 6 a.m. because he had things to do. Defendant took a bus to Venice and La Cienega. He went to a shopping center and saw several policemen "milling around." Knowing that the area was a high crime area—a "jungle"—he was afraid that he might be arrested. He walked north to get away from the police. When he reached Olympic and La Cienega he saw three more police cars. One of them started to come toward him. He decided that he had better leave. Continuously pursued by the police he found himself in a residential area. After a couple of abortive efforts to hide in other structures, he

"kind of a little bit panicked" and cut his way into the Rubin residence. He was then flushed out by the police who had caught up with him. He did not tell the police that he had been looking for money to visit his ailing mother. To the best of his knowledge his mother was not sick. At the time of the trial he did not know where Mr. Lambert was and had misplaced his address. He had known him for 15 years.

Additional facts will be stated during our discussion.

## DISCUSSION

On appeal defendant claims: (1) A certain ruling by the trial court resulted in denying him "his due process right to present testimony on his own behalf"; and (2) that the trial court committed reversible error in refusing his request for an instruction on trespass.

Defendant's first point results from the following facts: During a chambers discussion at the outset of the trial, the prosecutor made it a matter of record that he would not be using any prior burglary convictions to impeach defendant—he thought there were about five. Defendant then adverted to the fact that according to the police he made the following statement when he was cornered in the Rubin residence: "I guess I'm not as good as I used to be. How did you guys see me?" After some argument the court ruled that the probative value of that statement was outweighed by its prejudicial effect.[1]

Later on, during defendant's direct examination, his counsel asked: "Had you had any recent experience that caused you to have any particular fear of being arrested even if you hadn't done something?" The obvious purpose of that question was to explain defendant's asserted fear of the various police officers and units whom he encountered. At that point the prosecutor asked to approach the bench where counsel for defendant made the offer of proof copied below.[2] After some argument,

---

[1]The court added, however, "if other things develop that changes [sic] the purpose for which this is offered, I would reconsider my ruling. I'm just starting out from the front here and it applies certainly to the opening statement and People's case in chief."

[2]"Your Honor, the item we're about to go into is that it concerns events occurring just a few days before this in Pasadena during the daytime hours.

"Mr. McDonald was in Pasadena after having gone there by bus from Los Angeles and was walking on the street when the police stopped him, asked him a series of questions, took him into custody, jailed him for five days, and then released him without charges having been filed against him.

"I'm offering this evidence to show his state of mind and why he acted as he did

the court ruled that if defendant so testified the probative value of the previously supressed statement about defendant not being as good as he used to be would increase to the point where the court would reverse its previous ruling.

The upshot of all this was that defendant did not relate the Pasadena incident and the statement he made at the time of his arrest remained suppressed.

 It seems obvious to us that the trial court's ruling was well within its discretion. Defendant was caught in a strange residence in the small hours of the morning. He gave a bizarre explanation for his presence which he desired to bolster with a story—perhaps true, perhaps not—about his recent misadventures in Pasadena. It seems too obvious to require elaborate analysis that, the case having reached this posture, it became vital for the People to demonstrate that defendant's nighttime presence in a stranger's home was not triggered by the Pasadena incident but was, in truth, consistent with his lifestyle.

There was no error.

More serious is defendant's contention that the trial court committed error in refusing to request instructions on trespass.[3]

He first claims that, in spite of weighty authority to the contrary (e.g., *People v. Pendleton* (1979) 25 Cal.3d 371, 382 [158 Cal.Rptr. 343, 599 P.2d 649]; *People v. Yoder* (1979) 100 Cal.App.3d 333, 339-340 [161 Cal.Rptr. 35]) trespass is a necessarily included offense in the charge of burglary. His argument that the cited precedents and those on which they rely are wrong, is unconvincing.

In addition, however, defendant relies on the rule which had its genesis in *People v. Collins* (1960) 54 Cal.2d 57, 59-60 [4 Cal.Rptr. 158,

---

on the night of the arrest in this case—that would be the early morning hours of July the 7th.

"It goes to show state of mind, his thinking pattern, the possibility of the same sort of thing happening again.

"There has been no different conduct by him in Pasadena when he was arrested and held for five days without charges being filed than there was on this night, and attempts to explain why he was turning and avoiding the police which would have even more basis in the early morning hours than it would during the daytime when he was in Pasadena, because it would explain his conduct."

[3]Specifically defendant requested instructions on the crimes defined in sections 602, subdivision (*l*) and 602.5 of the Penal Code.

351 P.2d 326]. There the Supreme Court upheld a conviction for what was then known as statutory rape, although the information had charged forcible rape. The basis for the affirmance was that the age of the prosecutrix had been proved at the preliminary hearing. Therefore, the defendant had not been misled in preparing this defense. Further, the Supreme Court pointed out that statutory rape and forcible rape were both violations of the same Penal Code section which merely defined "the different circumstances under which an act of intercourse constitutes the crime of rape." This last consideration was for many years thought to be a limitation on the *Collins* doctrine. (*People v. Leech* (1965) 232 Cal.App.2d 397, 399-400 [42 Cal.Rptr. 745]; see also *People v. Tatem* (1976) 62 Cal.App.3d 655, 658 [133 Cal.Rptr. 265]; *People v. Ramos* (1972) 25 Cal.App.3d 529, 537, fn. 4 [101 Cal.Rptr. 230].) However, in *People v. Cole* (1979) 94 Cal.App.3d 854, 863 [155 Cal.Rptr 892], the court, in affirming a conviction of assault with a deadly weapon when the defendant had been charged with assault with intent to commit murder, held that "narrow interpretation accorded to the *Collins* decision by *Leech* and its progeny ignores the underlying reasoning of the *Collins* case and exalts form over substance."[4] Thus, although assault with a deadly weapon was not a lesser included offense in the crime of assault with intent to commit murder, the conviction was upheld under the *Collins*" doctrine because "the evidence *at the preliminary hearing* left no doubt that the assault with which defendant was charged involved the use of a deadly weapon." (*Id.*, p. 863, Italics added.) The *Cole* decision has been generally accepted. (*In re Walter S.* (1980) 105 Cal.App.3d 475, 481 [164 Cal.Rptr. 442]; *In re Beverly H.* (1980) 103 Cal.App.3d 1, 7 [162 Cal.Rptr. 768]; *People v. Muis* (1980) 102 Cal.App.3d 206, 212 [163 Cal.Rptr. 791].)

*People v. Muis, supra*, is particularly in point since it involved the affirmance of a conviction for trespass on a charge of burglary. The court

---

[4]With all respect, the *Cole* court overlooked the due process problems which *Collins* and *Leech* avoided by restricting the *Collins'* rule to convictions for the same offense as that charged in the information. Obviously the issue of fair notice to the defense is of an entirely different order if in a trial based on an information charging crime X, the defendant can be convicted of crime Y, which is not included in crime X by either of the two traditional tests (see *People v. Cole, supra*, 94 Cal.App.3d 861,) but is in the case merely because of stray testimony at the preliminary hearing.

Further we doubt whether prosecutors who take the long view should look at the *Cole* expansion of the *Collins'* rule with anything but alarm. Since defendants can hardly be denied instructions on offenses for which they could legitimately be convicted, they can use *Cole* and its spawn as a means for coaxing unwarranted compromise verdicts out of sympathetic juries. This very case is a good example of such an effort.

held that the requirement that the defendant not be misled in preparing his defense was deemed satisfied by the fact that "the transcript of testimony taken *at the preliminary hearing* left no doubt that the entry was nonconsensual." (*Id.*, p. 212. Italics added.)

It is obvious that, rightly or wrongly, we have come a long way since *Collins.*[5] ▮ Nevertheless, as far as the claim of error in this case is concerned, we feel bound to hold that defendant did not adequately support his request for a trespass instruction. He merely pointed out that trespass was "an offense shown by the evidence." That, of course, is quite insufficient. We know of no case which entitles a defendant to instructions on assorted misdemeanors revealed by the evidence *at the trial.*[6]

From the point of view of the application of the *Collins'* doctrine, the critical question would have been whether the evidence adduced *at the preliminary hearing* revealed a nonconsensual entry. We have, on our own motion, augmented the record with the transcript of that hearing and do find that Rubin was, at one point, asked: "Did anyone have permission to remove property from your home or enter your home?" He answered: "No." This, however, was never brought to the attention of the trial court, which, therefore, was not given any legally sufficient reason to instruct on trespass.

Affirmed.

Ashby, J., and Hastings, J., concurred.

---

[5]*In re Walter S., supra*, and *Beverly H., supra*, are inexplicable even on the basis of *Cole* expansion of the *Collins'* doctrine. Both were juvenile court cases in which there was, of course, no preliminary hearing. Closely read, however, each case properly rests on the minor's acquiescence in the trial court's consideration of a lesser but not included charge.

[6]In *People* v. *Pendleton* (1979) 25 Cal.3d 371 [158 Cal.Rptr. 343, 599 P.2d 649] a burglary conviction was affirmed and trespass instructions were held to have been properly refused, although the evidence showed that defendant had entered the victim's room without permission. In *People* v. *Bedolla* (1979) 94 Cal.App.3d 1 [156 Cal.Rptr. 171], the defendant was found guilty of assault with a deadly weapon. On appeal, he argued that the trial court should have instructed on four other offenses which were "'clearly made out by the evidence...'" (*Id.*, p. 9.) The court held that his argument was "wholly irrelevant. The supposed included offenses are not contained within the elements of the crimes charged. Therefore, no instruction on lesser included offenses was required." (*Id.*, p. 9.)