[No. A035641. First Dist., Div. Two. Oct. 26, 1987.]

DAVID FREEDMAN et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY et al., Defendants
and Respondents.

COUNSEL

Khourie & Crew, Daniel J. Furniss, Joel Linzner, Linda J. Margolies and Helen I. Muther for Plaintiffs and Appellants.

David H. Fleisig, Howard V. Golub, Robert L. Bordon, Barry S. Landsberg and Casson, Calligaro & Mutryn for Defendants and Respondents.

OPINION

SMITH, J.—Plaintiffs David Freedman (Freedman) and I.M.S. (U.S.A.), Inc. (IMS), appeal from an order granting a motion to dismiss their fifth

amended complaint against defendants Pacific Gas and Electric Company (PG&E), Mutual Petroleum Marketing Co., Inc. (MPM), and R. P. Benton (Benton) for plaintiffs' failure to diligently prosecute the action (Code Civ. Proc., § 583.420).

The issue is whether there was an abuse of discretion by the superior court. Finding none, we will affirm.

BACKGROUND

*The allegations*

Plaintiffs are oil brokers suing over commissions allegedly due them under two 1974 agreements. Underlying those agreements is an April 1974 contract (the sales contract) by which MPM, a New York corporation, agreed to sell crude oil to PG&E, a California corporation, through December 1975 with month-to-month extensions continuing beyond that term until canceled by either party. In a related contract (the exchange contract), PG&E agreed to pay MPM a service fee of 27.5 cents per barrel for having crude oil sold and delivered under the sales contract exchanged for refined oil.

There were two commission agreements. Under one executed in March 1974 (the MPM commission agreement), MPM promised to pay plaintiffs an aggregate commission of 13.75 cents for every barrel of crude sold under the sales contract (including any renewals or extensions). Under one executed in May (the PG&E commission agreement), PG&E (through defendant Benton, its materials department manager) promised to pay IMS 17 cents for each barrel, also for the life of the sales contract.

In mid-1975, plaintiffs executed releases of all claims against MPM and PG&E, as to both commission agreements, in return for payment of commissions on contract sales projected for the remainder of 1975. The releases recite that MPM advised plaintiffs that it had "negotiated to conclude" the sales contract with PG&E.

Plaintiffs filed an original complaint on August 24, 1981. As currently framed in the fifth amended complaint, their allegations are set out in three causes of action: (1) that PG&E breached its commission agreement with IMS by presenting plaintiffs with a final commission statement and yet continuing, to the present, to take deliveries pursuant to the sales and exchange contracts; (2) that PG&E and Benton intentionally interfered with plaintiffs' rights under the MPM commission agreement by advising that PG&E was no longer taking deliveries under the sales contract,

delivering a final commission statement and ceasing commissions after December 1975; and (3) that all defendants breached the MPM commission agreement by their acts. Each cause of action states that defendants' acts and concealment prevented plaintiffs from discovering the alleged wrongs until plaintiffs became aware of the continued sales in February 1981 through certain PG&E reports.

In a cross-complaint filed in January 1986, MPM alleged that plaintiffs breached the MPM commission agreement and their fiduciary duties to MPM when they subsequently entered and earned commissions under the PG&E commission agreement without MPM's knowledge or consent.

## The litigation

We glean the events material to defendants' motion to dismiss from a record that is in many respects incomplete or vague, and without the aid of a comprehensive statement of the relevant facts (Cal. Rules of Court, rule 13) from any party. Also, we will note some factual conflicts in the declarations but, for purposes of review, resolve them in favor of the judgment as the trial court apparently did. (*Gunner* v. *Van Ness Garage* (1957) 150 Cal.App.2d 345, 348 [310 P.2d 32].)

Freedman and former IMS president Harry Banks, since deceased, retained San Francisco Attorney Seymour Ellison (Ellison) in August 1981, and he filed the original complaint on their behalf that same month. Over the next 14 months, Ellison filed first, second, third and fourth amended complaints, each time after the superior court granted a demurrer or a motion to strike by PG&E and Benton, with leave to amend. MPM was not served until August 1982, about one year after the action was commenced.

The litigation stalled after then, for reasons that are not fully apparent from the record. PG&E demurred and moved to strike portions of the fourth amended complaint, and at a hearing on February 10, 1983, the superior court ordered parts of the complaint stricken and certain other modifications made. Unsatisfied with a proposed order drafted by PG&E, the court ordered preparation of a revised and interlineated complaint that would better reflect its ruling. Plaintiffs failed to do so, however, until their fifth amended complaint, filed about two and a half years later, on September 5, 1985. It appears from a series of letters from defendants' attorneys to plaintiffs' attorney, Ellison, that defendants at some point reached an understanding with Ellison that until he either filed a new or revised complaint, or elected to stand on the old one, all discovery plaintiffs had sought would be suspended indefinitely and defendants would not attempt to file answers. Ellison announced in November 1984 that he would be filing a fifth

amended complaint but did not follow through, and the prior understanding remained in effect. MPM had not yet demurred to the complaint but refrained from doing so on representations from Ellison that the existing pleading did not accurately state plaintiffs' claims against MPM.

Meanwhile, Ellison was placed on probation by the State Bar in February 1985 for misuse of client funds, a matter not involving these plaintiffs. He told Freedman about it and assured him that there was no reason to worry—that he could continue practicing law and representing the plaintiffs in this case. When MPM's president, Sanford Brass, also advised Freedman of the situation in a February 1985 phone call, Freedman replied that he already knew and that there was no problem with Ellison continuing in the case. According to Brass, Freedman said he still had " 'plenty of time under the five years to try the case.' " Freedman evidently did most of plaintiffs' interacting with Ellison. Janet S. Banks, the widow of IMS's former president, had apparently succeeded to her husband's office by then, but there is no record of her being involved in the litigation beyond signing documents.

Ellison's troubles escalated. He was arrested in July or August 1985 on a grand theft charge, again unrelated to his handling of these plaintiffs' case. An attorney named Arthur Groza was assigned by the State Bar in August to monitor funds and assist Ellison, where needed, with pending cases. Ellison did not tell plaintiffs about the arrest or criminal charges. However, he did tell Freedman in an August phone call that he was having some trouble with respect to his use of client funds and that it "would be worked out and would not affect his representation" of them.

Ellison was unsure at that point what the outcome of the charges or his standing with the State Bar would be, and he continued representing plaintiffs. He filed the fifth amended complaint on September 5 and conducted discovery against PG&E and Benton, who answered the complaint in October.

During this same time, Ellison deliberately refrained from pressing the case against MPM. According to him, Freedman "told me [in mid-1985] that he was engaged in settlement discussion with MPM's president, Sanford Brass, and asked me not to put pressure on MPM for the time being." MPM was contemplating changing counsel, and plaintiffs had agreed to extend the time in which MPM could answer the new complaint. On November 18, while in San Francisco on other business, Brass met for an hour and a half with Freedman and Ellison, and the three reached an agreement to settle with MPM. Ellison agreed to draw up the formal agreement but, within a week or 10 days, called Brass to say that the agreement was off. Brass accordingly went ahead and retained new counsel for MPM, who

filed MPM's answer and cross-complaint on January 6, 1986. According to Brass, the November 18 meeting was the only settlement effort, despite any contrary inference in what Freedman had told Ellison.

Ellison's involvement ended later that month. He tendered his resignation to the State Bar on January 17, after pleading guilty to the grand theft charges, and told Freedman he could no longer represent him. He also advised Freedman of the five-year statute and the need to bring a motion to advance the case to trial. On the 23d, all files in the case were turned over to the firm of Coblentz, Cahen, McCabe & Breyer, who agreed to take over the case. Freedman had already begun looking for new counsel the month before, after Ellison told him in a December phone call that he was having problems with the State Bar. Freedman had contacted the Coblentz firm himself, on the advice of a New York attorney. The State Bar filed Ellison's resignation on January 23 and, although the final disposition does not appear from the record, issued an interim suspension order in April. The Coblentz firm formally substituted in before then, on March 12. Meanwhile, Attorney Groza filed an at-issue memorandum for plaintiffs on February 6.

On March 24, exactly four years and seven months after the commencement of the action, MPM filed a motion to dismiss for lack of diligent prosecution (Code Civ. Proc., § 583.140 et seq.), and the other defendants joined in the motion.

Plaintiffs' formal representation by the Coblentz firm lasted only about two weeks. A conflict was discovered, and the firm of Khourie & Crew was therefore substituted in its place on March 28. The firm concurrently filed a motion to advance trial and served several discovery requests.

The motion to advance was heard by Judge Campilongo, who granted the motion and ordered a trial date of August 11. Defendants moved for reconsideration.

The motion to dismiss was subsequently heard by Judge Figone on May 9, before the motion for reconsideration could be heard. Judge Figone took the matter under submission and granted the motion in an order of May 16. Plaintiffs moved for reconsideration of the dismissal, relying in part on testimony by MPM president Sanford Brass taken in New York while the motion was under submission. Plaintiffs' motion was heard before Judge Figone on June 20 and denied in a minute order of June 26. In light of that ruling, defendants had their motion for reconsideration of the other matter taken off calendar, without prejudice.

Plaintiffs appealed on July 10 from the May 16 order granting the motion to dismiss and from a prior minute order as well.

APPEAL

I

Initially, there are problems of appealability not addressed by the parties. Code of Civil Procedure section 581d (all further section references are to that code) provides that a signed and filed *order of dismissal* is a judgment effective for all purposes. However, neither of the designated orders here actually orders the action dismissed. They only grant the motion, and there is no dismissal order in the record. Also, the minute order neglects to grant the motion as to PG&E and Benton, who had joined in the motion as brought by MPM. Only the subsequent order of May 16 correctly grants as to all defendants.

Because the minute order is incomplete and clearly intended to be preliminary to the court's May 16 order, we deem the May 16 order to be the "appealable" one. Also, rather than dismiss the appeal and return the parties to the superior court to obtain a dismissal order, a time-consuming formality, we will amend the order ourselves to add the needed dismissal and interpret the notice of appeal as applying to that dismissal. (*Bellah* v. *Greenson* (1978) 81 Cal.App.3d 614, 618 & fn. 1, 625 [146 Cal.Rptr. 535, 17 A.L.R.4th 1118].)

II

The trial court has discretion to dismiss an action for delay in prosecution (§ 583.410, subd. (a)) if it is not brought to trial within three years after it was commenced (§ 583.420, subd. (a)(2)(A)). "When the trial court has ruled on such a motion [formerly under § 583, subd. (a)], ' "unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." ' [Citations.] ' "The burden is on the party complaining to establish an abuse of discretion . . . ." ' [Citation.]" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].) The showing required to justify delay becomes greater as the time passes three years (formerly two) and approaches five, the time for mandatory dismissal. (*Brown* v. *Superior Court* (1970) 7 Cal.App.3d 366, 369 [86 Cal.Rptr. 670]; § 583.310.) The policy favoring trial or other disposition of actions on the merits is generally to be preferred over the policy that requires dismissal for failure to proceed with reasonable diligence. (§ 583.130; *Lyons* v. *Wickhorst* (1986) 42 Cal.3d 911, 916 [231 Cal.Rptr. 738, 727 P.2d 1019]; *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) Thus it is sometimes said that closer scrutiny is given to a grant, rather than a denial, of dismissal. (See, e.g., *Hilburger* v. *Madsen*

(1986) 177 Cal.App.3d 45, 51 [222 Cal.Rptr. 713].) However, the policy favoring trial on the merits is not absolute and may prevail only where the plaintiff makes a showing of excusable delay. (*Wilson* v. *Sunshine Meat & Liquor Co* . (1983) 34 Cal.3d 554, 562-563 [194 Cal.Rptr. 773, 669 P.2d 9]; *Farrant* v. *Casas de la Senda Homeowners Assn*. (1985) 170 Cal.App.3d 221, 227 [216 Cal.Rptr. 27].)

Factors a court must consider in ruling on the motion include, as far as pertinent here: "the extent to which the parties engaged in any settlement negotiations or discussions; the diligence of the parties in pursuing discovery or other pretrial proceedings . . . ; the nature and complexity of the case; . . . the condition of the court's calendar and the availability of an earlier trial date if the matter was ready for trial; whether the interests of justice are best served by dismissal or trial of the case; and any other fact or circumstance relevant to a fair determination of the issue." (Cal. Rules of Court, rule 373(e).)

The ultimate question on review is whether, under all the circumstances, the plaintiff has shown a "clear" or "manifest" abuse of discretion. (*Blank* v. *Kirwan, supra,* 39 Cal.3d 311, 331; *Wilson* v. *Sunshine Meat & Liquor Co., supra,* 34 Cal.3d 554, 561.) Plaintiffs herein rely on the conclusion in *Hurtado* v. *Statewide Home Loan Co* . (1985) 167 Cal.App.3d 1019 [213 Cal.Rptr. 712], that review in these cases poses "largely a question of law subject to plenary appellate scrutiny" and thus that the more deferential abuse-of-discretion standard does not apply. (*Id.,* at p. 1027.) However, as others have since noted, *Hurtado* runs counter to binding authority in *Blank* and *Wilson*. (*San Ramon Valley Unified School Dist.* v. *Wheatley-Jacobsen, Inc.* (1985) 175 Cal.App.3d 1050, 1054-1055 [221 Cal.Rptr. 342]; *Clothesrigger, Inc.* v. *GTE Corp.* (1987) 191 Cal.App.3d 605, 620-621 at fn. 3 [236 Cal.Rptr. 605] (dis. opn. of Lewis, J.) (rev. den. July 23, 1987).) We therefore decline to follow *Hurtado*.

## III

The key disputed question in this case is whether plaintiffs should be charged with Ellison's delay in moving the case to trial. Ellison conducted the litigation for them from the filing of the original complaint in August 1981 until January 1986, when he tendered his resignation and turned the case files over to other counsel—a period of four years and five months. It was only after then, beginning two months before MPM filed its motion to dismiss, that plaintiffs assumed independent control of the case. The question of imputing Ellison's negligence to them is therefore critical.

*Carroll* v. *Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892 [187 Cal.Rptr. 592, 654 P.2d 775] (*Carroll*), sets out the governing law in the context of

reviewing the grant of a motion for relief from default under section 473. Because relief from default depends on the party being able to show excusable neglect and implicates the same opposing policies of encouraging diligence yet having cases resolved on their merits, the reasoning of those cases is generally applicable in dismissal-for-delay cases. (*Aldrich* v. *San Fernando Valley Lumber Co.* (1985) 170 Cal.App.3d 725, 736 [216 Cal.Rptr. 300].)

"[A]s a general rule an attorney's inexcusable neglect is chargeable to the client. [Citation.]" (*Carroll, supra,* 32 Cal.3d at p. 895.)  ▮▮▮  "[A] party who seeks relief under section 473 on the basis of mistake or inadvertence of counsel must demonstrate that such mistake, inadvertence, or general neglect was excusable 'because the negligence of the attorney . . . is imputed to his client and may not be offered by the latter as a basis for relief.' [Citation.] The client's redress for inexcusable neglect by counsel is, of course, an action for malpractice. [Citations.]" (*Id.,* at p. 898.)

"However, an exception to this general rule has developed. '[E]xcepted from the rule are those instances where the attorney's neglect is of that extreme degree amounting to *positive misconduct,* and the person seeking relief is relatively free from negligence. . . . The exception is premised upon the concept the attorney's conduct, in effect, *obliterates the existence of the attorney-client relationship,* and for this reason his negligence should not be imputed to the client.' (Italics added.) [Citations.] Courts applying that exception have emphasized that '[a]n attorney's authority to bind his client does not permit him to impair or destroy the client's cause of action or defense.' [Citations.]" (*Ibid.*)

The court in *Carroll,* faced with a supportable trial court finding that plaintiff's counsel in that case had been guilty of "gross" negligence, nevertheless reversed the trial court's grant of relief as an abuse of discretion. The court reviewed and found distinguishable the leading cases which had found the "positive misconduct" exception applicable. In *Daley* v. *County of Butte* (1964) 227 Cal.App.2d 380 [38 Cal.Rptr. 693], an attorney's failure to serve a potential party plaintiff had resulted in repeated trial postponements; he failed to appear at successive pretrial conferences or to communicate with his client, the court or opposing counsel; and he refused either to proceed with the case or to get out of it. In *Orange Empire Nat. Bank* v. *Kirk* (1968) 259 Cal.App.2d 347 [66 Cal.Rptr. 240], the attorney had repeatedly assured his client that he was taking care of the case yet failed to interpose a crucial defense, file an appearance in the case, or show up for trial; and the client knew nothing about the resulting default until he discovered it on his own. In *Buckert* v. *Briggs* (1971) 15 Cal.App.3d 296 [93 Cal.Rptr. 61], the attorney had promised to inform the clients of a new trial date yet failed to do so or to show up for the trial; and after the clients found out about the default

on their own, he assured them that he would seek to set aside the judgment but never did and never contacted them. (*Carroll, supra,* 32 Cal.3d at p. 899.)

The court noted: "What *Daley, Orange Empire* and *Buckert* have in common is a *total failure on the part of counsel to represent the client: each attorney had de facto substituted himself out of the case.* Under such circumstances it would have been unconscionable to apply the general rule charging the client with the attorney's neglect. The case before us is, however, quite different. Though counsel grossly mishandled a routine discovery matter [resulting in dismissal for repeated failure to appear and obey motions to compel], no abandonment of the client appears. The record and counsel's own declaration reveal quite the opposite: after filing the complaint in 1975, he attended [a] deposition in August 1976, propounded interrogatories to a physician-codefendant and answered four sets of interrogatories by that defendant with whom he eventually settled. In July 1978 he propounded 40 interrogatories and 22 requests for admission to Abbott. When Abbott, in turn, served its request for production of documents, counsel did not ignore them . . . . Finally, after the action was dismissed, he started a rescue operation which resulted in the favorable judgment from which Abbott appeals. In brief, though in connection with the production of documents he obviously failed to give effective representation, he did not . . . 'obliterate the existence of the attorney-client relationship.' [Citation.]" (*Id.,* at p. 900, italics added.)

*Carroll* continues: " 'The policy that the law favors trying all cases and controversies upon their merits should not be prostituted to permit the slovenly practice of law . . . . When inexcusable neglect is condoned even tacitly by the courts, they themselves unwittingly become instruments undermining the orderly process of the law.' [Citation.] Given this concern, *the Daley exception should be narrowly applied,* lest negligent attorneys find that the simplest way to gain the twin goals of rescuing clients from defaults and themselves from malpractice liability, is to rise to ever greater heights of incompetence and professional irresponsibility while, nonetheless, maintaining a beatific attorney-client relationship." (*Ibid.,* italics added.)

▇▇ The trial court in this case expressly found that Ellison's performance did not fall within the narrow exception defined in *Carroll.* We agree. Ellison did not *totally fail to represent plaintiffs* and thus *de facto substitute out of the case.* (*Carroll, supra,* 32 Cal.3d at p. 900.) To the contrary, the record shows that he filed the original complaint in August 1981, resisted demurrers and motions to strike and filed four amended complaints over the next year and a half, and served all defendants within a year of commencing the action. Not much happened between the court's

ruling on the fourth amended complaint in February 1983 and the filing of the fifth amended complaint in September 1985. During that year and a half or so, there were only the letters with opposing counsel concerning the need for a modified complaint and attempts at discovery which, for the most part, had to be held in abeyance pending the modification. However, delay alone does not constitute client abandonment or "positive misconduct" in the *Carroll* sense. The *Carroll* exception applies "only where the attorney's misconduct effectively severs the attorney-client relationship. [Citation.]" (*Elston* v. *City of Turlock* (1985) 38 Cal.3d 227, 236 [211 Cal.Rptr. 416, 695 P.2d 713].) Plaintiffs do not claim that Ellison at any time refused to communicate with them or otherwise made himself unavailable. In fact, though the time frame is not specified, Freedman declared that he met with Ellison in San Francisco some 15 times over the course of the relationship. Finally, from the time of filing the fifth amended complaint until January 1986, when he turned the case files over to new counsel, Ellison deposed a PG&E employee, initiated other discovery against PG&E, and participated with Freedman in reaching a tentative settlement with MPM (which fell through). The record shows procrastination and delay, but not a severing of the attorney-client relationship.

Plaintiffs urge that this is a case not of mere delay, but of delay coupled with an attorney's affirmative concealment or misrepresentation of crucial matters. (See, e.g., *Carroll, supra,* 32 Cal.3d 892, 899 [discussing *Daley, Orange Empire* and *Buckert*]; *Tunis* v. *Barrow* (1986) 184 Cal.App.3d 1069, 1078 [229 Cal.Rptr. 389] [constant false assurances that a pink-slip matter was or would be cleared up, plus active concealment of the existence of the action].) However, their principal charge, based on a declaration by Freedman, is that "Ellison never informed plaintiffs that he was not effectively prosecuting the action [but rather] repeatedly (and falsely) assured plaintiffs that their case was proceeding with all deliberate speed." We are aware of no case in which such general, unfocused assurances have carried the day.[1]

Nor does Ellison's asserted failure to disclose his problems with the State Bar hold up, factually or legally. First of all, it is undisputed that Freedman knew of Ellison's probationary status since its inception, in February 1985. He was so advised both by Sanford Brass and by Ellison himself, who assured Freedman (correctly) that he could still practice law and handle the case. Second, while Ellison did not specifically disclose the fact of his subsequent (July or Aug.) arrest or the underlying charges, he did advise Freedman in August, and again in December, that he was having problems with the State Bar. There is direct evidence that Ellison's reassurances about

---

[1] Freedman actually stated: "I was very concerned about the pace at which this case was progressing and asked Mr. Ellison several times to proceed with the case. He repeatedly assured me that it was progressing well and with all possible speed."

being able to continue in the case were made in good faith, without knowledge that he would later have to resign his bar membership. Third and most important, there is no evidence—only supposition on plaintiffs' part—that Ellison's difficulties impaired his performance *in this case*. In fact, he did more during the five or six months between his arrest and resignation than he had in the preceding year and a half. Also, by the time Ellison tendered his resignation in mid-January 1986, Freedman had already sought new counsel, and the case files were turned over to them within a week.

We emphasize that this is not a case where the attorney purports to represent the client while disbarred or suspended from the practice of law. (See, e.g., *Aldrich* v. *San Fernando Valley Lumber Co., supra,* 170 Cal.App.3d 725, 738-739, 741.) New counsel took over the files on the day the State Bar filed Ellison's resignation, and interim suspension was not ordered until April, well after Ellison had formally substituted out.

Plaintiffs urge that the reasonableness of their reliance on Ellison is a factor bearing on whether to impute his negligence to them. They are mistaken. ▆▆ Whether the *Carroll* exception applies does depend on whether there is "positive misconduct" *and* whether the client is relatively free from negligence. (*Carroll, supra,* 32 Cal.3d 892, 898; cf. *Daley* v. *County of Butte, supra,* 227 Cal.App.2d 380, 392-393.) However, the test is a *conjunctive* one. The second part of the inquiry is immaterial if there is no positive misconduct, and there was none here.

*Aldrich* v. *San Fernando Valley Lumber Co., supra,* 170 Cal.App.3d 725, a case heavily relied on by plaintiffs, does not stand for a different or expanded view of client reliance. *Aldrich* acknowledged the conjunctive nature of the *Carroll* test and, *finding positive misconduct* (from the attorney's complete disappearance after being disbarred), accordingly went on to examine the client's own actions. (*Id.,* at pp. 738-741.) Moreover, the *Aldrich* court had further reason to focus on the client's actions. The case concerned a motion for relief from default brought nearly three years after a dismissal/default. (*Id.,* at pp. 731-732, 736.) The motion, directed to the court's inherent equity power to vacate a default on grounds of extrinsic fraud or mistake, demanded a strong showing of diligence in seeking relief. (*Id.,* at pp. 737-740.)

▆▆ The trial court correctly imputed Ellison's neglect to plaintiffs. Plaintiffs do not attempt to argue that Ellison's delay was excusable.

## IV

▆▆ The remaining question is whether it was an abuse of discretion under *all* the circumstances, including plaintiffs' efforts to undo the state of

affairs left them by Ellison, to order dismissal. Mindful that the test is whether the trial judge exceeded the range of discretion accorded to him—and not necessarily whether we would have ruled the same way—we find no abuse.

During Ellison's four years and five months on the case, plaintiffs managed to file a justiciable complaint (four years into the action), conducted limited discovery against PG&E, and conducted none against MPM. There were settlement efforts with MPM, but those were apparently limited to one meeting, in November 1985, and resulted in a tentative agreement that fell through within 10 days. Such nominal, latecoming efforts cannot excuse the preceding four years and three months of total inaction against MPM. (Cf. *San Bernardino City Unified School Dist.* v. *Superior Court* (1987) 190 Cal.App.3d 233, 239-240 [235 Cal.Rptr. 356].) Also, while it is true that plaintiffs granted MPM extensions of time in which to secure new counsel and answer the fifth amended complaint, MPM filed its answer and cross-complaint within six weeks of the settlement falling through. Plaintiffs cannot complain of the extensions of time when their own inaction prevented MPM from even responding to the lawsuit for over four years before then. Ellison had told MPM that the defective fourth amended complaint, which lay dormant for 18 months despite repeated prodding from PG&E and MPM, did not accurately reflect plaintiffs' claims against MPM. In sum, there is very little to mitigate the four years and five months of delay that accrued under Ellison's representation.

Plaintiffs do appear to have diligently sought new counsel, and it was not their fault that their first choice, the Coblentz firm, turned out to have a conflict of interest necessitating the Khourie firm stepping in. However, the Coblentz firm did not formally substitute in or file anything in the action during the six to seven weeks (Jan. 23 to Mar. 12) that they had the files. Obviously, no conflict of interest was known during that time; otherwise, the formal substitution executed at the *end* of that time would never have occurred. Thus, the most that can be said of the conflict, as it later developed, is that formal substitution of new counsel was delayed from March 12 to March 27—two weeks.

Defendants' motion to dismiss was filed on March 24, *four years and seven months* into the action. Except for an at-issue memorandum filed by Groza on February 6, plaintiffs had not moved the case any further by then than they had when Ellison took leave.

Four days later, on March 28 (along with filing their new substitution of attorneys), plaintiffs served discovery requests, sought leave to file a sixth amended complaint that would have added four new causes of action, and

filed their motion to advance the case to trial based on the pendency of the five-year limit. Our courts have long taken a dim view of such postmotion activity and have discounted it as "nothing [but] an effort to build up a belated defense to the motion." (*Dunsmuir Masonic Temple* v. *Superior Court* (1970) 12 Cal.App.3d 17, 22 [90 Cal.Rptr. 405]; see also *Lopez* v. *Larson* (1979) 91 Cal.App.3d 383, 395 [153 Cal.Rptr. 912].) It may be, as counsel for plaintiffs later declared, that some of the discovery (interrogatories and requests for admissions and documents) was prepared prior to the dismissal motion being filed and was delayed by having to await the Khourie firm's substitution in. Even so, the difference is only a matter of days; the discovery came very late either way. Also, counsel never claimed that the other discovery (deposition notices), the motion to advance or the request to file a sixth amended complaint was prepared beforehand.

That was the history of plaintiffs' activities when Judge Figone heard the dismissal motion on May 9. For reasons set out in the margin, we conclude that plaintiffs' then recent victory in getting a preferential trial date set within the five-year period added little, if anything, to their showing.[2]

We look next to defendants' showing of prejudice from the delay. Plaintiffs insist, first, that a defendant must always show actual prejudice, and

---

[2] There was conflicting authority at the time of the motion to advance whether a trial court had any discretion to deny preferential trial setting where the case was running up on the five-year mark. The issue was resolved by our Supreme Court but not until three months after the motion in this case was heard. *Salas* v. *Sears, Roebuck & Co.* (1986) 42 Cal.3d 342 [228 Cal.Rptr. 504, 721 P.2d 590], clarified that "the decision to grant or deny a preferential trial setting rests at all times in the sound discretion of the trial court in light of the totality of the circumstances" (*id.,* at p. 344) and that a court "does not have a mandatory duty to set a preferential trial date, even when the five-year deadline approaches" (*id.,* at p. 349). The motion in this case was heard just three and a half months before the five-year mark, and it appears from the record on the motion that the court may have been impressed with Court of Appeal authority, later to be disapproved in *Salas,* holding that a court could not consider "the plaintiff's lack of diligence or prejudice to the defendant once the five-year bar is imminent." (*id.,* at p. 346.) Thus, we cannot assume that the court properly exercised its discretion. *Salas* confirmed that motions to advance and to dismiss implicate essentially the same factors (*Wilson* v. *Sunshine Meat & Liquor Co., supra,* 34 Cal.3d 554, 560-561; *Troupe* v. *Courtney* (1985) 169 Cal.App.3d 930, 935 [215 Cal.Rptr. 703]), a principle that was in doubt when Judge Campilongo granted preferential setting here.

A further reason to discount Judge Campilongo's ruling is that it was in a sense provisional—that is, still subject to defendants' motion for reconsideration—at the time when Judge Figone granted defendants' motion to dismiss. We do not know whether the trial date would have stood. (Cf. *White* v. *Mortgage Finance Corp.* (1983) 142 Cal.App.3d 770, 775 [191 Cal.Rptr. 277] [dismissal affirmed where case was set for trial but without prejudice to a pending motion to dismiss].) Defendants had the motion for reconsideration taken off calendar, but *without prejudice,* after their motion to dismiss was granted.

Bearing all that in mind, the existence of the trial date does not significantly affect our decision. (*Gunner* v. *Van Ness Garage, supra,* 150 Cal.App.2d 345, 348 [dismissal affirmed where plaintiff's diligence in obtaining a trial date did not outweigh prior counsel's inaction].)

second, that the record here refutes the existence of such prejudice. We have to disagree on both points.

■ First, the notion advanced in a trio of 1985 Court of Appeal decisions that actual prejudice must always be shown (*Hurtado* v. *Statewide Home Loan Co., supra,* 167 Cal.App.3d 1019, 1029-1030, followed in *Troupe* v. *Courtney, supra,* 169 Cal.App.3d 930, 934, and *Luti* v. *Graco, Inc.* (1985) 170 Cal.App.3d 228, 235-236 [215 Cal.Rptr. 902]) has been impliedly overruled by the more recent decision by our Supreme Court in *Blank* v. *Kirwan, supra,* 39 Cal.3d 311, where a dismissal under the same statutory authority involved here was affirmed despite *no* showing of actual prejudice. The plaintiff in *Blank* had done virtually nothing for almost three and a half years. Reacting to the plaintiff's objection that the defendants had not been prejudiced, the court explained: "[E]ven if they have not, '[t]he legislative policy underlying [former] section 583 [now § 583.420, subd. (a)] is not grounded solely in prejudice caused by ·delay to a defendant. Its purpose, too, is to expedite the administration of justice by compelling every person who files an action to prosecute it with promptness and diligence.' [Citations.]" (*Id.,* at p. 332.) We are not the first court to recognize that the rule of the *Hurtado* line of cases is irreconcilable with *Blank* and not to be followed. (See, e.g., *Longshore* v. *Pine* (1986) 176 Cal.App.3d 731, 736 [222 Cal.Rptr. 364].) Of course, prejudice remains a factor even after *Blank*. (*Dick* v. *Superior Court* (1986) 185 Cal.App.3d 1159, 1166-1167 [230 Cal.Rptr. 297]; *Hilburger* v. *Madsen, supra,* 177 Cal.App.3d 45, 50-52.)

■ Second, defendants in this case clearly *did* show actual prejudice in any event. All events crucial to this lawsuit took place in 1974 and 1975, 11 to 12 years before the motion to dismiss was brought. Plaintiffs had failed to frame their contentions against MPM until the fifth amended complaint in September 1985, and had conducted no discovery against MPM. An important witness, former IMS president Harry Banks, had died since the original complaint was filed. In response to a postmotion request for document identification and production, MPM objected that the delay and longstanding lack of a justiciable complaint had deprived MPM of the opportunity to complete discovery of its own and that MPM had encountered "considerable difficulty" in locating records and files. MPM indicated that further responsive information would be divulged if and when discovered. In a deposition taken while the dismissal motion was still under submission, MPM president Sanford Brass explained that he was currently the only MPM employee, that the company had become inactive several years ago and had moved to smaller quarters, and that company records had been burnt or thrown away at that time. Records had also been dumped "[f]rom time to time all along." In page after page of testimony about events in 1974 and 1975, Brass displayed a poor or nonexistent memory of transactions,

memos, meetings, past understandings, whether documents were sent, whose writing appeared on documents he was shown, who people were and where they might be now.

Plaintiffs try to characterize the case as involving simple facial interpretation of known documents, and they point to testimony by Brass that he cannot recall any particular documents being missing. However, the case is obviously not that simple. A brief review of the questions asked at the Brass deposition shows that the documents alone do not resolve important issues, and the fact that Brass cannot pinpoint particular missing documents tends more to *prove* than to disprove prejudice. Finally, it is clear from reading the fifth amended complaint that PG&E's defense is in many ways factually bound up in MPM's. Thus, prejudice to one defendant is prejudice to the other.

Actual prejudice has been shown. Moreover, courts hold that prejudice *inheres* in cases like this one, where long delay inevitably results in dimmed memories and lost witnesses. (See *Lopez* v. *Larson, supra,* 91 Cal.App.3d 383, 401-403; *Martin* v. *K & K Properties* (1987) 188 Cal.App.3d 1559, 1565-1566 [234 Cal.Rptr. 161].)

In conclusion, plaintiffs have not met their burden of demonstrating a manifest abuse of discretion. We summarily deny defendants' request for sanctions. (§ 907; Cal. Rules of Court, rule 26(a).) Plaintiffs' appeal lacks merit but is far from "frivolous" in the sense mandated by *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179].

### DISPOSITION

The order of May 16, 1986, granting defendants' motion to dismiss is amended by adding to it a paragraph dismissing the action (see part I, *ante*); as so amended, the order is affirmed.

Kline, P. J., and Benson, J., concurred.