Filed 6/30/14  P. v. Sanchez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESSE DANIEL SANCHEZ,<br><br>    Defendant and Appellant. | G049900<br><br>(Super. Ct. No. INF1100417)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Ronald L. Johnson, Judge (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.).  Affirmed.

Lynelle K. Hee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

\*                    \*                    \*

A jury convicted Jesse Daniel Sanchez of second degree murder (Pen. Code, § 187, subd. (a)) for slaying 20-year-old Jesus Guerrero, and prohibited possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1); all further undesignated statutory references are to this code). On the murder count, the jury found numerous penalty enhancement allegations to be true: Sanchez personally used a firearm, (§12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.5,3 subd. (c)) causing great bodily injury or death (§ 12022.53, subd. (d)), and personally used a handgun (§ 12022.5, subd. (a)). The trial court sentenced Sanchez to an aggregate indeterminate term of 40 years to life in state prison.

Sanchez contends the trial court erred in excluding evidence Guerrero and a friend of Guerrero's present at the shooting were members of a criminal street gang. Sanchez also argues the trial court failed to instruct the jury fully on perfect and imperfect defense of others, and on lawful possession of a firearm in self-defense and defense of others. As we explain, these contentions are without merit and we therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On February 4, 2011, Sanchez hosted his two nephews, 14-year-old Fabian S. and 21-year-old Jorge Reyes, at his Indio apartment, where the trio spent the evening drinking tequila, beer, sparkling wine, and taking Xanax pills. Reyes's stepbrother, Jose Uribe, arrived later in the evening with Guerrero. Although the others regarded Uribe as part of the family, Sanchez did not feel a close bond with him, explaining later to the police, "[H]e's not my real nephew . . . . He's just my sister's boyfriend's son, that's all." The five continued drinking alcohol, taking pills, and began smoking marijuana.

2

Uribe had a gun tucked in his waistband. He placed the gun on the kitchen table, removed the magazine, and everyone including Sanchez took turns handling the weapon and passing it around.

Guerrero's sister, Alma Ramirez, and a 15-year-old friend, Peter G., arrived to drive Guerrero, Reyes, and Uribe to the bowling alley. Guerrero and Reyes met them in the driveway, but Uribe remained inside looking for his gun. According to Uribe, Sanchez wanted to keep the gun because he did not feel safe in his home, so Sanchez hid it in a cabinet, "played dumb that he was loaded, [and that] he didn't know where it was" when Uribe asked for it.

According to Uribe, when he found the gun and tried to exit through the front door, Sanchez "put a wire around his neck and pulled him back into the apartment." Fabian slammed the door on Reyes to keep him from reentering the apartment, locked the door, and Fabian and Sanchez kept Uribe's arms pinned to his side. Sanchez repeatedly punched Uribe in the face while trying to pry the gun from Uribe's hand. As Sanchez was "just sockin' [Uribe] and beatin' the shit out of [Uribe]," he told him, "'[T]his is what you need, little punk.' . . . 'You're gonna get fuckin' robbed.'" Uribe called out for help, but Sanchez began choking him and Fabian attacked Uribe with a knife. Uribe lost consciousness as he saw Guerrero "come through the wall" and begin struggling with Sanchez, who had wrested the gun from Uribe.

According to Ramirez, Guerrero had been waiting in her car when she and Guerrero heard Uribe call out for Guerrero by his nickname, "'Bugsy, Bugsy, kick down the door. Bugsy, help me. Kick down the door.'" Guerrero exited the vehicle and after kicking at the apartment door to no avail, he wrapped his jacket around his fist and punched out a window by the door, but something inside the window blocked his entry.

3

Guerrero hopped on the hood of a nearby van or truck and from there kicked out another window in the apartment to gain entry. Ramirez and Peter G. could see Guerrero inside the apartment holding a piece of "two-by-four" framing wood over his head, arguing loudly with someone.

Reyes, from his nearby vantage point, also outside the apartment, could see Sanchez and Guerrero fighting; Guerrero did not have anything in his hand and the two had wrapped each other in a bear hug. Reyes walked back towards Ramirez's car and told her, "'They're fighting with your brother.'" At some point in the altercation, Peter G., who was in the car with Ramirez, heard someone threaten, "'I'm going to shoot you.'"

Ramirez heard the word "gun" from inside the apartment, and Reyes tried to assure her "'it's not even loaded,'" but when she heard a gunshot, she exited her car and looked through the window Guerrero had entered. She saw her brother on the ground with someone trying to hold him up and move him, while Sanchez stood over him. Ramirez thought Sanchez was stabbing Guerrero. Reyes told her, "'They shot your brother.'" She retreated to her car; in the midst of the confusion, she saw someone with a white, bloodstained shirt open the front door. Through the open door, Peter G. saw two people kicking "a guy" laying on the floor, and he called 911 as Ramirez drove away.

Reyes, meanwhile, had noticed Guerrero trying to wrestle a gun from Sanchez's grasp during their altercation, but Reyes never heard the weapon discharge. According to Reyes, Fabian had the gun when Guerrero jumped into the apartment, but Sanchez grabbed it from Fabian during his fight with Guerrero. After Reyes spoke briefly with Ramirez at her car before she left, he returned to the apartment and found the front door open; he entered and discovered Guerrero on the floor with a gunshot wound

in his back. Reyes sought in vain to find Guerrero's pulse, and he heard Sanchez say, "'Oh, fuck. What did I do?'" Sanchez was holding the gun. According to Reyes, Uribe "was barely waking up" around this time, and Uribe noted that when he regained consciousness he found his "best friend [Guerrero] dead." Sanchez ran out of the apartment holding the gun in his hand, telling Uribe and Reyes to "'get the fuck out of here.'" Uribe soon heard sirens approaching.

Jason Polanco of the Indio Police Department responded to the apartment around 11:30 p.m. and found Guerrero's body about 10 feet inside the front door. Guerrero had a bullet hole in his back right shoulder, with an exit wound on the front left side of his body. A later autopsy revealed the bullet traveled through Guerrero's body from back to front, right to left, and slightly downward "through large vessels, the aorta and the pulmonary artery and also through the lung." Soot and a faint muzzle stamp around the entrance wound on his back indicated the gun was in contact or within a few millimeters of Guerrero's skin when someone pulled the trigger. Blood tests showed cannabinoids but no alcohol and a relatively small amount of anti-anxiety medication such as valium or Xanax in Guerrero's system when he died.

In on-scene and subsequent police interviews and in their testimony at trial, Reyes and Uribe fleshed out the evening's events. Reyes explained Sanchez and Fabian were "all Xanaxed out" and "jacking [Uribe] for the gun," refusing to return it. They rebuffed Uribe's requests with a curt rejoinder, "'You ain't getting shit.'" Reyes recounted generally that Sanchez and Fabian "were acting all crazy" that night. Reyes reiterated that at the time of the shooting, Sanchez and Guerrero were locked in a struggle trying to wrestle each other to the ground. According to Reyes, Guerrero attempted to

disarm Sanchez when it looked like he fell and was trying to get back up, but Sanchez shot him in the back.

Uribe confirmed he still had the gun when he lost consciousness after Sanchez and Fabian attacked him with the wire garrote, punching him and slashing him with a knife. Uribe awoke with stab marks on his body and a swollen face. Before he passed out, he saw Guerrero engage Sanchez when Guerrero came through window, and he believed the gun must have discharged while they were fighting. Reyes told him Sanchez shot Guerrero in the back. Uribe lamented, "'My own uncle, fucking, just does that to me and shoots my fucking homie, my fucking best friend.'"

When Polanco responded to the scene, he recognized Fabian from prior encounters and noticed Fabian's forearms and the front torso area and lower back portion of his shirt were covered with blood droplets. Fabian gave no reply when Polanco asked what happened, and feigned ignorance when responding to another detective's inquiries, initially denying he was at the apartment when the shooting occurred. But then he told the detective variously that the shooting took place in a dispute over Xanax or as Uribe attempted to purchase marijuana. According to Fabian, Uribe and Guerrero joined together to fight Sanchez, so Sanchez "picked up the gun." Asked who shot Guerrero, Fabian acknowledged, "'I guess Jesse [Sanchez] did it,'" but Fabian refused to provide Sanchez's telephone number "because he couldn't give that information out about a family member." Fabian hesitated in identifying Sanchez in a photographic lineup, explaining he did not pick out Sanchez's picture initially because he loved his uncle and did not want to see him get in trouble. He did not suggest Uribe assaulted him anytime that evening, nor did he mention Uribe and Guerrero dragging Sanchez on the ground in the apartment, as he later claimed.

6

The detective dropped Fabian off at his grandmother's home around 7:00 a.m. that morning, but immediately returned to that address when he learned Sanchez had phoned the police. Extra police units surrounded the residence, and when Sanchez fled and tried to jump over a back fence, he fell and "cut . . . the top of his head open," an injury Sanchez later attributed to his fight with Guerrero. As Sanchez was led away in handcuffs, he yelled at his nephews Fabian and Reyes, "'Tell them Jose [Uribe] did it. Tell them he did it.'"

Fabian testified Uribe accused him of hiding his gun, and shoved Fabian around the apartment, before finding it in one of the cabinets. Fabian had seen Uribe place the gun there, but did not remind Uribe because he was afraid Uribe would lash out in violence with the gun. According to Fabian, he did not remember anything else about the evening except Uribe accusing him of knowing where the gun was, but the jury also heard Fabian's preliminary hearing testimony in which he attempted to exculpate Sanchez.

Fabian testified at the preliminary hearing that Uribe, angry over his missing gun, tried to beat him up, but when he lunged at Fabian, Sanchez intervened. Uribe found his gun and threatened Sanchez with it, but Sanchez fought off Uribe, even though Uribe pointed the gun at Sanchez and taunted him, "'You want to mess around now.'" Uribe called for Guerrero when Sanchez knocked Uribe to the ground, and after Guerrero jumped through the window, he and Uribe held Sanchez while Uribe struck Sanchez in the head with an object. Sanchez told Fabian to leave, but when Fabian saw Guerrero and Uribe dragging Sanchez towards the bathroom, Fabian drew a pocketknife to defend Sanchez. According to Fabian, Uribe and Sanchez were wrestling for the gun when it discharged, felling Guerrero. Fabian never saw Sanchez with the gun.

7

The police interviewed Sanchez after taking him into custody. Sanchez initially claimed he was in his bedroom when he heard a gunshot, so he fled the apartment. Then he suggested he tried to intervene in a dispute between Uribe and Guerrero over the gun, but Uribe threatened to shoot both him and Guerrero, so when Sanchez heard a gunshot, he fled. Later in the interview, he admitted Fabian hid the gun and claimed that when Uribe began beating Fabian up while Sanchez was in the bathroom, Sanchez came to Fabian's assistance, but Uribe pointed the gun at him. While Uribe screamed for Guerrero's help, Sanchez disarmed Uribe, casting the gun to the floor, where Fabian grabbed it when Guerrero entered through the window.

Sanchez denied knowing how Guerrero got shot, but when the detectives suggested his story did not make sense, he responded, "it was self-defense, and I would say that, but I just don't want to go to jail . . . ." He added, "[S]elf-defense, I mean, the guy whacked me in the head, I got five stitches, right here, and everything." Sanchez suggested Guerrero may have taken the gun from Fabian, but also said he (Sanchez) took the gun from Fabian because "that way [Guerrero] doesn't shoot my nephew." Sanchez showed the detectives the gash in his head that Guerrero inflicted with two blows, and he explained that when he and Guerrero wrestled for the gun, it accidentally discharged, killing Guerrero.

Sanchez gave the detectives a written statement, as follows: "'February 5, 2011. 100 percent. I, Jesse Sanchez, and . . . Uribe, [Guerrero], Fabian [and] Sanchez, were at my home. [Uribe] had a gun. They were drinking, popping pills. [Uribe] asked Fabian to put the gun away and he did. Then when they were leaving, [Uribe] asked for the gun. Fabian said he can't find it. [Uribe] started choking Fabian because he couldn't find it, so I beat up [Uribe]. Then [Uribe's] friend, Bugsy [Guerrero], breaks my

8

window, [and] jumps in. Then we start struggling for the gun and we struggle and it went off . . . . Please, self-defense.'"

At trial, Sanchez repeated his claim that he intervened to protect Fabian from Uribe, who was choking Fabian and slamming him against the wall. Sanchez heard Uribe yelling, "'You fuckers, I found it. You guys tried to burn me,'" and he heard Fabian pleading, "Stop it. You're hurting me." Sanchez was getting the better of Uribe when Guerrero crashed through the window and stunned him with two blows to the head. The next thing he remembered, Uribe and Guerrero were dragging him to the bathroom, where he feared they would kill him. He was able to grab the gun from Uribe, but Guerrero lunged toward him, grabbed the gun, and they struggled chest-to-chest for five or 10 seconds before the gun fired. Sanchez only sought to gain possession of the gun.

Sanchez denied he shot Guerrero, but also testified he did not know whether he or Guerrero pulled the trigger on the lone gunshot, which struck Guerrero in the back. Uribe picked up the gun and fled, and Sanchez walked to his mother's house. His mother testified Sanchez was bleeding from a head wound, and the next morning she overheard Uribe telling someone, "'Dawg, don't worry about it. We got the gun. We cleaned it with mud. And we put it in the first row of palm trees.'"

Sanchez also testified that three months before the shooting, Guerrero shot a gun at him. Sanchez had mentioned in his police interview that he and Guerrero had exchanged insults ("'Fuck you'" and "'Fuck your town'") in an odd incident where someone in a van pulled out a shotgun in front of another of Sanchez's nephews, Fernando Lopez, who Sanchez described as crazy ("[h]e's a fifty-one fifty"). Guerrero lived on the same block as Lopez, and came outside shouting at Sanchez during the van incident. At trial, however, Sanchez claimed Guerrero came outside *shooting* at him, so

9

he ran. Nevertheless, after that, he "backed up" some "North Side" guys, including Guerrero and Uribe, when they "g[ot] jumped" and "were fighting some guys from Coachella." He claimed in the interview that despite backing up North Side, he was not liked by North Side guys.

The jury convicted Sanchez as noted above, and he now appeals.

II

DISCUSSION

A. *No Error in Excluding the Victim's or Uribe's Gang Affiliation*

Sanchez contends the trial court erred in excluding evidence of Guerrero's and Uribe's gang affiliation. He argues "evidence that Uribe and Guerrero were both in the North Side Indio gang was relevant to demonstrate the nature of their relationship and the lengths to which Guerrero would go to back up Uribe." Specifically, Sanchez argues that "Guerrero's incentive to assist Uribe went far beyond friendship. When appellant was attacked, the reputation of the North Side Indio gang was at stake, and Guerrero's reputation, and potentially his own safety, was at stake if he did not assist Uribe. This evidence was necessary for the jury to evaluate Guerrero's physical response to appellant after Guerrero broke through the window to appellant's home, in order to protect his fellow gang member."

The trial court excluded evidence of any of the participants' gang affiliation as highly prejudicial under Evidence Code section 352. The trial court allowed vague references to the North Side gang during Sanchez's recorded police interview, including the suggestion Uribe and Guerrero were active members in that gang, because the court deemed those stray references "insignificant." But the court explained "this is not a gang case" and barred Sanchez from eliciting confirmation that Uribe or Guerrero belonged to

10

the gang. The court noted the defense argued at the outset that "this was not a gang case." The court explained that the evidence amply demonstrated Guerrero and Uribe were best friends, and therefore their association with any organization, whether "the Boy Scouts or LA Crips," would add little in light of Uribe's testimony that he considered Guerrero like a brother and would die for him, and Guerrero would do the same for him.

The trial court also observed when defense counsel attempted to elicit gang evidence from one of the investigating officers: "I've allowed the witness [Investigator Biggers] to answer regarding his feeling that some of the witnesses may have been tempering their responses because of some fear of retaliation from people on the street. I think that's all appropriate. [¶] But to go into the elements [of a criminal street] gang and what this officer's experience is with the gang is far afield and is being excluded under [section] 352, primarily for time consumption. I don't think it's relevant to the question before the jury and it's peripheral and would take us down a road that would take time and introduce to the jury information that's not appropriate for them to consider in their judgment."

We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.) Under Evidence Code section 352, the trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The Supreme Court has cautioned that gang evidence must be scrutinized even when it is relevant, due to its potentially inflammatory impact. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) A trial court's ruling on the admissibility of gang evidence is reviewed for abuse of discretion. (*Branch*, at p. 282.)

11

The trial court did not err in excluding additional gang evidence beyond what leaked into the trial. Defense counsel referred to Guerrero and Uribe as "thugs" and "punks" and "young men who go to parties with loaded nine millimeter guns." Counsel also alluded to a "code on the streets," suggested Guerrero and Uribe lived a lifestyle of "groups of young men that do these things," and suggested the duo had a connection "out on the streets of Indio" that was "much deeper than a family connection."

The trial court in its discretion reasonably could reject the loyalty rationale Sanchez offered as a basis to admit Uribe's and Guerrero's gang affiliation. The evidence already admitted left no doubt of their mutual loyalty. Uribe described their bond in unequivocal terms, and Guerrero's actions demonstrated more powerfully than any testimony his profound loyalty to Uribe. Admitting gang evidence would only invite unwarranted speculation and a waste of time and judicial resources to delve into Sanchez's own gang affiliations and his complicated relationship with North Side, in which he admitted he "backed up" North Side and its members, but complained they still did not like him.

Sanchez argues the gang affiliation evidence was necessary to lend credibility to his claim Guerrero struck him violently and that Guerrero and Uribe dragged him toward a bathroom, likely with the intent to kill or injure him. But Sanchez proffered no evidence the nature of the assault bore marks unique to North Side, and therefore it would be pure speculation for the jury to infer on the basis of their alleged gang membership that Uribe and Guerrero dragged Sanchez or did so with a murderous intent, as he claimed. In effect, Sanchez's position amounted to the claim that if Uribe and Guerrero were gang members, they must have done bad deeds in the altercation. As the trial court observed, Sanchez made no effort to ground his claim in the evidence by

12

suggesting, for example, that he "knew [Guerrero] was a gang member and that scared me."

Instead, Sanchez sought to counter the heroic picture the prosecutor painted of Guerrero coming to Uribe's rescue, but the trial court properly concluded Sanchez could not legitimately "dirty up" Guerrero with irrelevant gang evidence. The court reasonably could conclude, as defense counsel earlier had argued, that this was not a gang case, but rather a tragic incident among family and friends to be resolved on Sanchez's core self-defense claim. There was no error.

B.      *The Jury Resolved Sanchez's Defense of Another Claims Against Him*

Sanchez contends the trial court erred by omitting from its self-defense instruction any language pertaining to defense of another, except in the title of the instruction. The trial court instructed the jury with CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another, as follows: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." Sanchez contends the instruction violated his right to a ""'"meaningful opportunity to present a complete defense"'"" (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324) because it did not include his defense theory that he not only acted in his own defense, but in defense of his 14-year-old nephew Fabian.

13

We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) Except where inconsistent with the defense theory, the trial court must instruct the jury on "any affirmative defense for which the record contains substantial evidence . . . ." (*People v. Salas* (2006) 37 Cal.4th 967, 982; *People v. Breverman* (1998) 19 Cal.4th 142, 157.) The instructions, however, must be considered together as a whole. (*People v. Osband* (1996) 13 Cal.4th 622, 679; see CALCRIM No. 200 ["Pay careful attention to all of these instructions and consider them together"].) Consequently, where a factual question is resolved adversely to a defendant under other jury instructions, omission of an instruction bearing on the same factual question is harmless. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 96-97; *People v. Sedeno* (1974) 10 Cal.3d 703, 721, overruled on another ground in *Breverman*, *supra*, 19 Cal.4th at p. 165, [no prejudice in omission of instructional language because "the evidence that would support [the defendant's theory] has been rejected by the jury"].)

Here, it appears the trial court was persuaded by the prosecutor's argument that Sanchez "mentioned he feared for himself, but never mentioned he feared for another individual," and the court also noted Sanchez "testified he had no idea where Fabian was when he and the decedent were wrestling over the gun." But as Sanchez correctly points out, other evidence may support a requested instruction even if the defendant does not affirmatively testify he acted in defense of others. (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 51.) While the bulk of the trial testimony reflected Sanchez's concern for his own safety, even assuming the trial court erred in overlooking Fabian's and Sanchez's pretrial statements that Sanchez intervened to protect his nephew, the omission of pinpoint language in CALCRIM No. 505 concerning defense of others was harmless because other instructions directed the jury to resolve that issue. (CALCRIM

14

Nos. 506 [Justifiable Homicide: Defending Against Harm to Person Within Home or Property], 3477 [Presumption that Resident Was Reasonably Afraid of Death or Great Bodily Injury].)

In particular, CALCRIM No. 506 instructed the jury that "[t]he defendant is not guilty of murder/manslaughter if he killed to defend himself or any other person in the defendant's home." The instruction specified: "Such a killing is justified, and therefore not unlawful, if: [¶] 1. The defendant reasonably believed that he was defending a home against JESUS GUERRERO, who violently tried to enter that home intending to commit an act of violence against someone inside; [¶] 2. The defendant reasonably believed that the danger was imminent; [¶] 3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; [¶] AND [¶] 4. The defendant used no more force than was reasonably necessary to defend against the danger." The instruction also specified: "The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

Sanchez contends this language was insufficient because the jury "could have determined the government disproved the defense of habitation (CALCRIM No. 506), but found appellant acted in lawful defense of others when Guerrero was shot." Sanchez's theory appears to be that the jury could conclude he was not defending his *home* from Guerrero's violent *entry*, but instead reacted to defend himself and Fabian when Uribe called out for Guerrero's help. But the distinction is too finely drawn and makes little sense; the instruction itself specified that in defending oneself or others in danger within the home (i.e., Fabian), the defendant justifiably defends the home and is entitled to acquittal. We must presume the jurors read as a whole the instructions given

15

to them and did so in a rational fashion (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73), and Sanchez's bid for reversal therefore fails.

Sanchez also argues the trial court erred in failing to instruct the jury on defense of others in its imperfect self-defense instruction. The trial court instructed the jury on imperfect self-defense in the language of CALCRIM No. 571, Voluntary Manslaughter: Imperfect Self-Defense — Lesser Included Offense. In particular, the instruction stated: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] . . . [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Sanchez argues that failing to include imperfect defense of others in the foregoing instruction violated his right to present a complete defense. Sanchez asserts the error requires reversal because the government cannot establish it was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), whereas the Attorney General appears to concede the error and argues only that it is not reasonably probable the omission affected the jury's verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) We conclude any error was harmless even under the most stringent standard.

The gist of Sanchez's claim is that the jury was denied the opportunity to acquit him if it concluded he may have *unreasonably* but in good faith actually believed Fabian needed his aid to defend against a threat of great bodily harm or death. We are confident, however, that omitting defense of others from the imperfect self-defense

16

instruction did not affect the outcome given the jury resolved his imperfect self-defense claim against him. Sanchez does not explain the discrepancy inherent in his claim, i.e., that the jury rejected his own self-defense and imperfect self-defense claims, but somehow would credit his imperfect defense of others claim. In other words, it is hard to fathom on the facts presented the jury crediting an unreasonable belief in the need to defend Fabian, but not also a reasonable or unreasonable need for Sanchez to defend himself. The verdict showed the jury placed no stock in Sanchez's defense claims, and given the evidence Uribe was prevented from leaving and garroted from behind and that Guerrero was shot in the back, overwhelming evidence supported the jury's conclusion. Sanchez's argument for reversal has no merit.

C.      *The Jury Resolved Sanchez's Claim of Lawful Gun Possession Against Him*

Sanchez contends the trial court erred in providing a necessity instruction instead of a more tailored instruction on his necessity defense to the charge of unlawfully possessing a firearm. Sanchez argued the necessity of defending himself and Fabian against imminent harm justified his temporary possession of the firearm despite the prohibition triggered by his status as a felon. As the Supreme Court explained in *People v. King* (1978) 22 Cal.3d 12, 24, prohibitions on a felon's possession of a firearm were "not intended to affect a felon's right to use a concealable [or other] firearm in self-defense. . . . Thus, when a member of one of the affected classes is in imminent peril of great bodily harm or reasonably believes himself or others to be in such danger, and without preconceived design on his part a firearm is made available to him, his temporary possession of that weapon for a period no longer than that in which the necessity or apparent necessity to use it in self-defense continues, does not violate" prohibitions against a felon's firearm possession.

17

Here, the trial court instructed the jury with CALCRIM No. 3403 as follows, in pertinent part: "The defendant is not guilty of [the crime of] prohibited person in possession of a firearm as charged in count 2 if he acted because of legal necessity. [¶] In order to establish this defense, the defendant must prove that: [¶] 1. He acted in an emergency to prevent a significant bodily harm or evil to himself or someone else; [¶] 2. He had no adequate legal alternative; [¶] 3. The defendant's acts did not create a greater danger than the one avoided; [¶] 4. When the defendant acted, he actually believed that the act was necessary to prevent the threatened harm or evil; [¶] 5. A reasonable person would also have believed that the act was necessary under the circumstances; [¶] AND [¶] 6. The defendant did not substantially contribute to the emergency."

Sanchez contends the trial court prejudicially erred by failing to instruct the jury with an instruction tailored to his self-defense and defense of others claim, as provided in CALCRIM No. 2514, Possession of Firearm by Person Prohibited by Statute: Self-Defense. As we explain, however, the necessity instruction expressly recognized self-defense and defense of others as valid grounds for firearm possession "to prevent a significant bodily harm or evil to [one]self or someone else," and therefore Sanchez was not deprived of his right to present a meaningful defense to the possession charge. To the contrary, the jury resolved the issue against him.

CALCRIM No. 2514 provides in pertinent part: "The defendant is not guilty of unlawful possession of a firearm [, as charged in Count ____,] if he temporarily possessed the firearm in self-defense or defense of another. The defendant possessed the firearm in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of suffering great bodily injury;

18

[¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] 3. A firearm became available to the defendant without planning or preparation on his part; [ ¶] 4. The defendant possessed the firearm temporarily, that is, for a period no longer than was necessary or reasonably appeared to have been necessary for self-defense; [¶] 5. No other means of avoiding the danger of injury was available; [¶] AND [¶] 6. The defendant's use of the firearm was reasonable under the circumstances."

We note that absence in the necessity instruction of the third element in CALCRIM No. 2514 — a firearm became available to the defendant without any planning or preparation on his part — may have benefitted Sanchez because the evidence suggested he colluded with Fabian to hide the gun from Uribe for Sanchez's later possession or to forcefully steal the gun by garroting Uribe with a wire as he walked out the door.

In any event, Sanchez argues two requirements in the necessity defense that are absent from CALCRIM No. 2514 harmed him. Specifically, he objects to elements three and six in the necessity instruction, namely that he "did not create a greater danger than the one avoided" and he did not "substantially contribute to the emergency." He argues the jury improperly "might have rejected necessity because it believed appellant[']s act result[ed] in a greater danger than the one he sought to avoid . . . or that appellant substantially contributed to the emergency by fighting with Uribe and later Guerrero." We are not persuaded.

As noted previously, the jury instructions must be read in conjunction with one another and we presume the jury heeds this admonition. If the jury had credited under CALCRIM No. 506 Sanchez's self-defense and defense of another claims, the jury

19

would not conclude he caused "a greater danger than the one he sought to avoid" or that he "contributed to the emergency" by fighting Uribe and Guerrero while defending himself or Fabian. Nothing suggests the jury somehow misread these requirements or interpreted them in an improper fashion, but rather the jury simply resolved the self-defense and defense of another claims against Sanchez. The requirements that Sanchez not create a greater danger than he sought to avoid nor contribute to the emergency do *not* misstate the law, as Sanchez implies, but instead are integral to a valid self-defense or defense of another claim. Specifically, as noted, the defendant may respond in self-defense or defense of another *only* with the force necessary to defend against the danger (CALCRIM Nos. 505, 506), not greater force creating a greater danger than he faced. And the defendant cannot invoke self-defense or defense of another as a pretext, but instead must believe the immediate use of force is necessary to defend against the danger (CALCRIM Nos. 505, 506), rather than using force to contribute to or trigger an emergency, as the necessity instruction correctly proscribes.

Finally, Sanchez complains the necessity instruction shifted the burden of proof to him to prove by a preponderance of the evidence he was entitled to the necessity defense. In the particular circumstances here, however, there was no error because the self-defense and defense of another instructions (CALCRIM Nos. 505, 506) unequivocally placed the burden on the People to disprove those defenses beyond a reasonable doubt. In other words, if the jury had concluded Sanchez acted in self-defense or defense of another, the jury also would have concluded the necessity defense was valid on the firearm charge. We find no error under any standard of review.

20

## III

## DISPOSITION

The judgment is affirmed.


                                        ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.